In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3435

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARIA MORENO,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-cr-00576-6 — **Robert M. Dow, Jr.**, *Judge.*

ARGUED APRIL 5, 2019 — DECIDED APRIL 25, 2019

Before FLAUM, KANNE, and SCUDDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* A jury convicted Maria Moreno of one count of conspiring with others with the intent to distribute narcotics and two counts of knowingly using a telephone in furtherance of the conspiracy. Moreno argues there was insufficient evidence to support a finding that she conspired with the Guzman Drug Trafficking Organization (the "Guzman DTO"), but rather, the evidence merely showed a buyer-

seller relationship. The district court rejected Moreno's motion for judgment of acquittal based on this argument, and we affirm.

## I. Background

### A. Overview & Indictment

In September 2013, the government filed a thirteen-count indictment against Moreno and five codefendants—Miguel Guzman, Alfredo Torres, Sergio Zacahua, Acasio Sanchez, and Fabian Foster—alleging conspiracy. Moreno is named in three counts: Count 1 charged Moreno with conspiracy to possess narcotics with the intent to distribute, in violation of 21 U.S.C. § 846; and Counts 9 and 11 charged Moreno with knowingly using a telephone in furtherance of the alleged conspiracy, in violation of 21 U.S.C. § 843(b). According to the government, from approximately July 2012 through July 16, 2013, Moreno participated in a conspiracy to sell narcotics in Chicago and Detroit. Guzman, the head of the Guzman DTO, and Guzman's subordinates supplied two to four kilograms of heroin to Moreno once or twice a month, and Moreno delivered that heroin in Detroit.

### B. Evidence at Trial

Moreno pleaded not guilty and her case advanced to a jury trial. The government's evidence consisted primarily of recorded telephone conversations between Moreno and codefendants, testimony of Torres, and testimony of law enforcement officers involved in the surveillance and arrest of the indicted codefendants.

According to Torres, Moreno, unlike her codefendants, was not a Guzman DTO member. She "was just a customer" with "her own clients," "[u]nrelated to … [the] organization."

For instance, she did not look for clients for the Guzman DTO, and she did not use—or even know the location of—the Guzman DTO stash house. Moreover, while Guzman paid Torres, Zacahua, and Foster a percentage of drug-trafficking profits for "their services," Moreno received no such payment.

Torres testified he first met Moreno, who he knew only as "the lady," at Guzman's audio shop in mid-2012. Guzman instructed Torres to deliver heroin to Moreno on an ongoing basis, "whenever she needed it." A few days later, Torres delivered heroin to Moreno at a restaurant in Chicago. This was the first of many deliveries. Typically, Moreno drove from Detroit to Chicago in a truck with a hidden trap compartment. She parked at a restaurant or gas station and left money in the trap. Then, Torres, Zacahua, or Foster drove the truck to the stash house, retrieved the money from the compartment, placed heroin inside, and returned the truck to the designated location. Torres said Moreno paid about $200,000 for four kilograms of heroin, and sometimes, at Guzman's direction, he provided Moreno heroin on credit: "sometimes I would deliver, but she wouldn't give me the money." Torres mentioned one instance specifically, but he did not remember the date and did not know when or how Moreno eventually delivered the money.

On May 26, 2013, the government intercepted a call between Moreno and Torres. They spoke about Moreno's Chevy Trailblazer, a vehicle with a trap compartment. Moreno told Torres, "if they are going to fix it today, then I can pick it up tomorrow." At trial, Torres explained that Guzman instructed him to fix a smashed window on the Trailblazer. Torres did not ask Moreno to reimburse him because Guzman said he would pay the costs of the repair.

The next day, Torres told Moreno, "If you want I can meet you … to at least give you the keys." Torres testified he was talking about the Trailblazer, and he said he delivered the keys to Moreno at a gas station in Chicago. Drug Enforcement Agency ("DEA") agents observed Moreno arrive at the gas station, and an agent took a photo of Moreno and Torres together. After the meeting, Moreno went to a nearby restaurant, entered an already-parked Trailblazer, and drove east.

The DEA maintained surveillance until Moreno entered Indiana. At that point, an agent contacted the local Indiana sheriff's department, told it of the ongoing investigation, and requested it conduct a traffic stop. Officers stopped Moreno and discovered she was not the Trailblazer's registered owner. Per department policy, they towed the vehicle to a county garage for an inventory search. Officers discovered an empty concealed trap compartment in the rear of the vehicle. They also found a glass repair receipt with the name "Alfred Torres."

Following the traffic stop, Moreno called Torres.[1] Moreno advised Torres to "drop those phones," and she told him the police "took the truck away" and "follow[ed]" her. She also informed Torres she would "come down there on Wednesday at four (4:00)" and "won't call" anymore. Torres explained at trial that when Moreno told him to drop the phones, he believed his phone "had already been tapped by the authorities." Later that night, Torres asked Moreno whether officers "[found] anything," and said "hopefully nothing happens because I also had my receipt in there for … the glass. My name was on it."

---

[1] This conversation is the basis for Count 9.

After the May 27 incident, Moreno stopped traveling to Chicago. Instead, Foster drove heroin to Moreno in Detroit. According to Torres, Foster completed two deliveries of four kilograms of heroin. But in July, the government intervened.

On July 12, Moreno asked Torres, on a recorded call, if "that guy could come by early on Monday." Torres responded, "how much would it be," and Moreno said, "the same." Torres testified the "guy" was Foster, when he asked "how much" he meant how many kilograms of heroin, and when Moreno said "the same," she meant she wanted the same quantity, four kilograms. On July 15, Torres and Moreno spoke about the delivery.[2] They agreed it was "already too late," and instead, "[d]uring the day would be good." Ninety minutes later, Torres spoke with Foster and told him, "The lady says … she wants you [to] arrive … no late[r] than nine o'clock (9:00) so, what do you say about tomorrow?" Foster said he would "be ready all day," and they agreed to meet at six o'clock (6:00) the next morning. That evening, Torres confirmed the delivery with Moreno: "[W]ill you be ready tomorrow around twelve (12:00) or one (1:00), around there, the friend says he should be arriving around that time. At two (2:00) at the latest."

The next morning, the DEA established surveillance at the Guzman DTO stash house. At 6:19 AM, Zacahua called Torres to tell him "the door is not opening" in "the truck." Torres testified Zacahua was referring to the trap door of a Dodge Durango, and Zacahua intended to put four kilograms of heroin in the trap compartment for the delivery. Torres also tried and failed to open the trap door, so he instead placed the four

---

[2] This conversation is the basis for Count 11.

kilograms of heroin in the back seat. At 6:31, he called Foster and told him, "I'm gonna leave you under the back seat because I can't open" the door.

Eventually, a red Dodge Durango (driven by Zacahua) exited Sanchez's garage, and agents followed the vehicle. Zacahua parked the Durango, exited the truck, walked a few blocks, and entered Torres's vehicle. Then, Foster arrived at Torres's vehicle. Torres testified he gave Foster a note with Moreno's phone number, dropped Foster off near the Durango, and drove away. As Foster approached the Durango, DEA agents placed him under arrest. They searched the Durango and found four brick-shaped bundles of heroin under the back seat, totaling about four kilograms and worth about $240,000. They also seized Foster's cell phones, the note with Moreno's phone number, and a receipt showing that about a month earlier, Foster stayed at a motel ten minutes south of Detroit. After his arrest, Foster cooperated and told agents he planned to drive the Durango to Detroit and deliver heroin there. The agents also arrested Torres, Zacahua, and Sanchez.

Two DEA agents drove the Durango to the motel near Detroit at which Foster said he planned to make the delivery (they removed the heroin before doing so). This was the same motel where Foster had stayed a month earlier, per the receipt found in the Durango. When they arrived, an undercover agent called Moreno from Foster's cell phone and told her the Durango was parked at the "[s]ame hotel."

Shortly thereafter, a Chevy Trailblazer entered the lot and parked next to the Durango. Two women—Moreno and her niece—exited the vehicle and walked into the hotel lobby, without bags or luggage. Moreno sent a text message to Foster's phone saying she lost the key to the Durango and he

should come to the motel room with the key. The undercover agent responded that an extra key was under the Durango's floor mat. Moreno and her niece left the motel and walked to the Durango. When they reached it, agents placed Moreno under arrest and searched Moreno and her niece. Moreno had three cell phones. One was a personal phone, one was the phone she used to communicate with Torres and Foster, and after they seized the third phone, it received a text message that said, "Down here wit my money." Agents also found a spare key to the Durango in Moreno's Trailblazer.

### C. Verdict & Post-Trial Motion

After the government closed its case, Moreno moved for judgment of acquittal. The court took the motion under advisement. Moreno chose not to testify on her own behalf and did not call any witnesses in her defense. On April 21, 2016, the jury found Moreno guilty of conspiring with others to possess narcotics with the intent to distribute, in violation of 21 U.S.C. § 846 (Count 1), as well as knowingly using a telephone in furtherance of the conspiracy, in violation of 21 U.S.C. § 843(b) (Counts 9 and 11).

Moreno filed a post-trial motion for judgment of acquittal, arguing the government failed to prove beyond a reasonable doubt that she conspired with the Guzman DTO. More specifically, she argued that while the evidence demonstrated she purchased drugs from the Guzman DTO, it did not allow the inference of conspiracy. On January 30, 2017, the district court denied Moreno's motion. It held the government presented sufficient evidence of conspiracy, including that Moreno made frequent large-quantity drug purchases on credit, Moreno shared equipment—vehicles with trap compart-

ments—with the Guzman DTO, and Moreno warned members of the Guzman DTO about threats by law enforcement. On November 20, 2017, the court sentenced Moreno to a below-Guidelines 87-month term of imprisonment.

## II. Discussion

If the evidence presented at trial is insufficient to support a conviction, a district court must enter judgment of acquittal "either after the government has closed its evidence or after a jury has rendered a verdict or been discharged." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019); *see* Fed. R. Crim. P. 29(a), (c). We review a district court's denial of a motion for judgment of acquittal de novo. *Garcia*, 919 F.3d at 496.

Because we afford "[g]reat deference … to jury verdicts," we "view[] the evidence in the light most favorable to the government" and draw all reasonable inferences in the government's favor. *United States v. Maldonado*, 893 F.3d 480, 484 (7th Cir. 2018). Moreover, "[a]ny challenge to the sufficiency of the evidence comes with a heavy, indeed, nearly insurmountable, burden," and we "reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (first quoting *United States v. Dessart*, 823 F.3d 395, 403 (7th Cir. 2016), then quoting *United States v. Brown*, 726 F.3d 993, 1005 (7th Cir. 2013)). At the same time, "the height of the hurdle depends directly on the strength of the government's evidence," and "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Garcia*, 919 F.3d at 496–97 (first quoting *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013), then quoting *Jackson v. Virginia*, 443 U.S. 307, 317 (1979)).

To prove a § 846 conspiracy, the government must show "(1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement." *Maldonado*, 893 F.3d at 484 (quoting *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010)). "Although every drug deal involves an unlawful agreement to exchange drugs, … a buyer-seller arrangement can't by itself be the basis of a conspiracy conviction because there is no common purpose: '[T]he buyer's purpose is to buy; the seller's purpose is to sell.'" *United States v. Long*, 748 F.3d 322, 325 (7th Cir. 2014) (second alteration in original) (quoting *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir. 1978)). Rather, "the government must offer evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals." *Maldonado*, 893 F.3d at 484 (quoting *Johnson*, 592 F.3d at 755). A conviction cannot stand if "the plausibility of a mere buyer-seller arrangement is the same as the plausibility of a drug-distribution conspiracy." *United States v. Pulgar*, 789 F.3d 807, 812 (7th Cir. 2015).

Often, the government meets its burden by showing the buyer agreed to resell drugs to a third party. *Long*, 748 F.3d at 326; *see United States v. Neal*, 907 F.3d 511, 515 (7th Cir. 2018) (per curiam) ("[A] shared purpose—some unity of enterprise—between a buyer and seller to resell drugs to others can be enough to indicate the requisite common commitment to demonstrate a conspiracy to distribute drugs."). But to prove a resale agreement, the government cannot "rely solely on purchases and sales, which after all are present in both buyer-seller and conspiracy arrangements." *Long*, 748 F.3d at 326. Instead, the government must present additional circumstantial evidence. *Id.*

To evaluate whether circumstantial evidence is sufficient to support an inference of conspiracy, "[w]e take into account all [of] the evidence surrounding the alleged conspiracy and make a holistic assessment of whether the jury reached a reasonable verdict." *Id.* (alterations in original) (quoting *Brown*, 726 F.3d at 1002); *see Pulgar*, 789 F.3d at 813 ("[T]here is no rigid list or formula to prove a conspiracy…."). Circumstantial evidence that indicates conspiracy, and not just a buyer-seller relationship, includes, for example: large-quantity drug sales; repeated or standardized transactions; a lengthy relationship between the parties; sales on credit (*i.e.*, fronting); warnings of threats by competitors or law enforcement; and sharing tools and supplies. *Maldonado*, 893 F.3d at 484–85; *Pulgar*, 789 F.3d at 815–16.

To be sure, large-quantity, repeat sales alone do not support an inference of conspiracy. *Maldonado*, 893 F.3d at 485; *see also United States v. Lechuga*, 994 F.2d 346, 349 (7th Cir. 1993) (en banc). Neither do "'occasional' sales on credit." *Neal*, 907 F.3d at 516 (quoting *United States v. Cruse*, 805 F.3d 795, 815 (7th Cir. 2015)); *see also Long*, 748 F.3d at 326 ("Standing alone, … sales on credit [cannot] sufficiently distinguish a conspiracy from an ordinary buyer-seller relationship." (citations omitted)).

Together, however, this type of evidence can support a conspiracy finding. "'[W]hen a credit sale is coupled with certain characteristics inherent in an ongoing wholesale buyer-seller relationship,' the jury can infer that the seller only extended credit because the buyer agreed to pay the debt by reselling the drugs." *Long*, 748 F.3d at 326 (quoting *Johnson*, 592 F.3d at 775 n.5). The buyer and seller share the common purpose—to resell the drugs to close out the credit transaction—

necessary to distinguish the arrangement from a mere buyer-seller relationship. *Id.*; *see United States v. Moreland*, 703 F.3d 976, 987 (7th Cir. 2012) ("[T]he jury could find that [the defendant] knew that his supplier would not sell him wholesale quantities of drugs on credit unless he agreed to resell them, and by thus agreeing with his supplier to commit a crime (the resale of the illegal drugs), he became a conspirator.").

Here, Moreno and the Guzman DTO had a year-long relationship during which Moreno regularly purchased wholesale quantities of heroin. Specifically, Torres testified that from mid-2012 until Moreno's arrest in July 2013, he or an associate provided two to four kilograms of heroin to Moreno once or twice a month. Additionally, there is evidence of at least two instances when Moreno purchased the heroin on credit. Torres stated that "[o]n one occasion, [Moreno] delivered the money later." And a factfinder could reasonably infer a second instance of fronting: when Moreno arrived to purchase heroin at the Detroit motel on July 16, 2013—the day she was arrested—she carried no money and received a text message which read, "Down here wit my money." A jury could infer Moreno planned to obtain money from a buyer—the text message sender—*after* she acquired the drugs.

Additional evidence also supports the jury's conspiracy inference. For instance, Moreno sought to protect the Guzman DTO by warning it about potential law enforcement intervention. After Indiana police seized her Chevy Trailblazer, Moreno quickly notified Torres. She urged Torres to "drop those phones" and told him that police "follow[ed]" her from Chicago. Later, Moreno and Torres spoke further about the incident and discussed whether they might be at further risk.

Moreno contends her warning was not evidence of conspiracy, but self-protection. We disagree. If Moreno wanted to simply protect herself and minimize her exposure, there would be no reason for Moreno to talk to Torres about the incident. Instead, Moreno could have driven straight home without talking to anyone. Indeed, Moreno already thought law enforcement was suspicious of her—she believed they followed her from Chicago and were listening to her calls. Thus, she must have realized law enforcement might still be listening to her conversations with Torres. Yet she warned Torres anyways. A reasonable jury is entitled to characterize such behavior as evidence Moreno agreed to more than just a buyer-seller relationship with the Guzman DTO. *Cf. Maldonado*, 893 F.3d at 485 (evidence of a conspiratorial relationship included that the defendant called his supplier to inform him of the arrest of a drug-trafficking associate); *United States v. Nunez*, 673 F.3d 661, 666 (7th Cir. 2012) (affirming a finding of conspiracy, noting that "[w]hen [the defendant] learned of [his supplier's] arrest the defendant could simply have cleared out; instead he tried to save [his supplier's] business" by notifying his supplier's supplier of the arrest).[3]

---

[3] Moreno argues our opinion in *United States v. Johnson* indicates Moreno's warning to Torres is irrelevant. *Johnson* is distinguishable. In *Johnson*, the defendant advised his supplier the police were nearby while the supplier "was en route to deliver the drugs." 592 F.3d at 757. We held "this singular warning is insufficient to establish the existence of a conspiracy" because "in this situation, any ordinary drug purchaser would warn his supplier of a nearby police presence to ensure he received the delivery." *Id.* As we explained, "[t]his is not conspiratorial behavior; it is self-preservation." *Id.* Here, by contrast, Moreno did not call Torres while he was on the way to deliver drugs. She faced no immediate risk; rather, a jury could infer Moreno made the call to protect the Guzman DTO.

Moreover, there is evidence the Guzman DTO and Moreno shared "tools": two vehicles with trap compartments used to transport drugs and money. First, Moreno and Torres drove and cared for the Chevy Trailblazer. Specifically, Torres took the Trailblazer to a shop to repair a broken window. Torres testified he paid for the repair and did not seek repayment from Moreno because Guzman said he would cover the costs. Second, when DEA agents arrested Moreno, they found a key to Foster's Dodge Durango in her Trailblazer. In short, Moreno's shared use of vehicles with Torres and Foster supports the reasonableness of the jury's conspiracy inference. *See Maldonado*, 893 F.3d at 485 (noting, as evidence the defendant and his supplier "occasionally worked cooperatively," that the defendant "loaned his Cadillac with a 'trap' compartment for drugs and drug proceeds to [his supplier]"); *Brown*, 726 F.3d at 1006 (emphasizing, as evidence of the defendant's role in a conspiracy, that his supplier "provided [the defendant] with a specially outfitted Chevrolet HHR that had a 'trap' to conceal drugs").

Moreno points to our decision in *United States v. Pulgar*, and asserts we "addressed a strikingly similar situation" there. Like in this case, the government elicited evidence that an alleged conspiracy involved sales of wholesale quantities of narcotics, and sometimes, those sales were made on credit. 789 F.3d at 808. As to the credit sales, the government introduced one instance where the defendant fronted cocaine without advance payment during a sham sale arranged by the DEA, and a witness testified that the defendant "'probably' fronted cocaine to him 'a couple other' times." *Id.* at 814. We held this evidence did not indicate conspiratorial behavior be-

cause the first instance was "an adapted arrangement designed for self-preservation," and the testimonial evidence was "vague and incomplete." *Id.*

The evidence in *Pulgar* is distinguishable from the evidence here. Unlike the witness in *Pulgar*, Torres testified firmly, without a qualifier, that he fronted heroin to Moreno; that instance was not a government setup. Additionally, in *Pulgar*, we highlighted the lack of other evidence signaling conspiracy, such as, for example, the "provisioning of tools or supplies" and "warnings of threats to the business." *Id.* at 815.[4] Here, by contrast, the government presented such evidence. As discussed, Moreno warned Torres about a police threat, and Moreno and the Guzman DTO simultaneously accessed and cared for vehicles used to transport drugs.[5]

It is true, as Moreno points out, that the evidence suggests Moreno was not a member of the Guzman DTO. Torres testified Moreno "was just a customer," "[u]nrelated to … [the] organization." And unlike other DTO members, Moreno did

---

[4] The only other proffered evidence in *Pulgar* was that the defendant accepted returns of poor quality cocaine, and the defendant and coconspirator enjoyed a close friendship. We held this evidence was not probative of conspiracy; the return policy evidence was "vague and incomplete," and there was no evidence of "anything nefarious from [their] friendship." *Pulgar*, 789 F.3d at 814–16.

[5] Moreno also cites other cases where we overturned conspiracy convictions, and she asserts the "surrounding facts and circumstances" in those cases "gave rise to stronger inference[s] of conspiracies" than the facts here. Those cases are easily distinguishable; in each, there was no evidence of fronting. *See United States v. Musgraves*, 831 F.3d 454, 463 (7th Cir. 2016); *United States v. Colon*, 549 F.3d 565, 568 (7th Cir. 2008); *United States v. Contreras*, 249 F.3d 595, 600 (7th Cir. 2001); *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001).

not use the Guzman DTO stash house, did not have an agree-
ment with the Guzman DTO to look for customers, and did
not receive a commission. Perhaps based on Torres's testi-
mony, the government abandoned its theory at opening argu-
ment—that Moreno was "a member" of the Guzman DTO—
conceding at closing argument that it was "not here saying
she's a member of the Guzman organization." Crucially, how-
ever, the government did not need to prove Moreno was a
member of the Guzman DTO to prove she knowingly agreed
to participate in the conspiracy. As we have explained:

> It's true that [a witness] testified on cross-exam-
> ination that [defendants] were only … custom-
> ers, not members of the organization. But [de-
> fendants] didn't have to be members of [the]
> gang to be guilty of conspiring …; the legal def-
> inition of a conspirator is not the same as the
> street definition. Legally, [defendants] were
> guilty of conspiracy if they knowingly agreed
> [with the leader of the gang] to distribute
> drugs—regardless of whether [the leader] or
> anyone else ever considered them *real* members
> of the organization.

*Long*, 748 F.3d at 326–27.

In sum, the government offered sufficient evidence to sup-
port the jury's inference that Moreno knowingly agreed to
participate in a drug-trafficking conspiracy, not a mere buyer-
seller relationship. For over a year, Moreno consistently pur-
chased wholesale quantities of heroin from the Guzman DTO.
On at least two occasions, Moreno purchased that heroin on
credit. Moreno warned Torres about a law enforcement

threat. And Moreno and Guzman DTO members shared access to and responsibility for vehicles with trap compartments. Viewed holistically and considered together, the evidence is sufficient to support a guilty verdict.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.