In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 19-3476, 19-3481, 19-3484, 19-3537, 20-1113 & 20-1266

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GILBERTO VIZCARRA-MILLAN, *et al.,*

*Defendants-Appellants.*

———————————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cr-00222-JMS-TAB — **Jane Magnus-Stinson**, *Judge.*

———————————

ARGUED MAY 12, 2021 — DECIDED SEPTEMBER 30, 2021

———————————

Before FLAUM, HAMILTON, and BRENNAN, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Richard Grundy III and his network of drug suppliers, couriers, distributors, and dealers trafficked hundreds of pounds of methamphetamine in Indianapolis. Grundy and over two dozen co-conspirators were indicted. Most ultimately pled guilty. After a three-week trial, Grundy and four other defendants were convicted of all the charges against them. In these consolidated appeals, the five

trial defendants and one defendant who pled guilty challenge their convictions. There are no sentencing issues.

Grundy argues that the district court violated his Sixth Amendment right to counsel by improperly obstructing him from representing himself. Gilberto Vizcarra-Millan argues that the district court should have disqualified his chosen counsel due to a conflict of interest. Derek Atwater, James Beasley, and Undrae Moseby all challenge the denials of their untimely motions to suppress evidence. Atwater, Beasley, and Ezell Neville all contend that the evidence was insufficient to support some of their convictions.

We affirm the convictions of Grundy, Vizcarra-Millan, Moseby, Atwater, and Neville. We also affirm the conviction of Beasley on one count but reverse his convictions on two others. The evidence at trial necessarily left a reasonable doubt as to whether he committed those crimes. Beasley's case is remanded to the district court for resentencing on the one remaining count.

I. *Factual and Procedural Background*

We provide the basic outline of Grundy's network and the procedural history of this case here, with more specific details as needed for each defendant's appeal. Because the co-conspirators' appeals do not hinge on the substance of the conspiracy, we omit many of the details of the inner workings of Grundy's crew as presented during the trial.

A. *Grundy and his Crew*

Grundy has been of interest to law enforcement for years. He has been arrested or indicted for, among other things, murder and conspiracy to commit murder, though he was never convicted of so serious a charge. As recently as 2015 or

2016, he had been indicted on four counts of conspiracy to commit murder, but he ultimately pled guilty to a lower-level state charge for marijuana distribution.

After his plea in the state case, Grundy pooled seed money to restart his drug-trafficking network. Gilberto Vizcarra-Millan, who lived in Arizona, provided the drugs to Grundy. A network of couriers, including defendant Undrae Moseby, brought the drugs to Indiana.

Once the drugs arrived in Indianapolis, Grundy distributed them himself or via a network of wholesalers, including David Carroll. These wholesalers then sold to retail dealers, including Derek Atwater and James Beasley. Ezell Neville was another associate of Grundy's. The parties dispute the exact nature of his relationship with Grundy, but he also sold Grundy's methamphetamine. All told, Grundy and his crew brought at least 280 pounds of highly pure methamphetamine, as well as other drugs, to the streets of Indianapolis.

In May 2017, federal law enforcement obtained wiretaps for the cell phones of crew members. FBI agents also coordinated controlled drug buys from Grundy's dealers. Things started to fall apart for the Grundy gang in August 2017. Law enforcement seized over $84,000 in cash that was headed to Vizcarra-Millan to purchase more drugs. Next, in September 2017, agents intercepted a phone call between Carroll and Beasley discussing an upcoming methamphetamine deal. Soon after Beasley purchased the methamphetamine, local police stopped the car in which he was a passenger for a routine traffic violation. The officers smelled raw marijuana and recovered drug paraphernalia while searching the car. A search of Beasley's person uncovered methamphetamine. The driver of the car, Susan Koch, told the officers that Beasley

stored more methamphetamine in her home and gave her consent for a search that recovered more methamphetamine.

On November 17, federal agents executed several search warrants against members of the conspiracy. As relevant here, they uncovered methamphetamine and drug-trafficking paraphernalia at Atwater's house. They also raided what they believed to be the "clubhouse" of Grundy's gang. Several members of the conspiracy were present, and the police collected several cell phones, including two used by Moseby that contained incriminating evidence of his connection to the Grundy crew.

### B.  *Pretrial and Mistrial*

In two separate cases, over two dozen members of Grundy's gang were charged with federal offenses, including conspiracy to distribute drugs and money laundering. Most defendants ultimately pled guilty. David Carroll, one of Grundy's key wholesalers, agreed to testify for the prosecution. Carroll's attorney, John Tennyson, however, had also been retained by Vizcarra-Millan, who was charged in the second, formally distinct but related case. The government pointed out the potential conflict of interest—if Carroll were to testify at trial (which he had agreed to do), he might incriminate Vizcarra-Millan. If he did, Tennyson's duties to his respective clients would conflict. See Indiana Rule of Prof'l Conduct 1.7.

Two district judges held hearings to discuss the conflict with Vizcarra-Millan and whether he wanted to waive it. At the first hearing with Judge Barker, the potential conflict appeared both minor and unlikely to become actual, and Vizcarra-Millan said he would waive any conflict of interest.

When both of the *Grundy* cases were later consolidated before Judge Magnus-Stinson, she also held a hearing that ended with Vizcarra-Millan again waiving his right to unconflicted counsel.

But then, five weeks before trial, attorney Tennyson filed a motion to withdraw the waiver because his client had rejected the government's plea offer and said he intended to go to trial. Contrary to what he had told both judges months earlier, Tennyson now claimed his conflict of interest prohibited him from adequately representing Vizcarra-Millan at all. Judge Magnus-Stinson denied Tennyson's motion without holding a hearing. Vizcarra-Millan later pled guilty without a deal from the government.

In the meantime, the district court had set a deadline in February 2019 for filing motions to suppress evidence. Months later, just days before trial, defendants Beasley and Moseby submitted motions to suppress, styled as evidentiary motions in limine. The district court denied both motions.

Trial got under way on July 8, 2019, in Indianapolis. The court took the unusual step of empaneling an anonymous jury after the government came forward with evidence of attempted witness tampering and intimidation. The court provided juror information to defense counsel but forbade the defendants themselves from learning the jurors' names or detailed personal information from which they could be identified. The first trial did not last long. By day three, the district court learned that, despite the precautions, some defendants had gotten their hands on this confidential information. Moseby had written down the names of several jurors. Grundy had obtained partially redacted juror questionnaires.

The district court declared a mistrial and moved the trial venue to Evansville.

Between the mistrial and the second trial, Grundy moved to represent himself. He wanted to pursue his own strategy, but he also wanted standby counsel to help him with the nuts and bolts of lawyering. The district court held a hearing that ended when Grundy ultimately declined to waive his Sixth Amendment right to counsel.

C.  *Second Trial and Posttrial Procedure*

The second trial lasted three weeks. As relevant here, several co-conspirators testified against Grundy, implicating him as the mastermind of this drug trafficking ring. The evidence showed that Atwater, Beasley, and Neville all bought drugs from Grundy or one of his associates. The details of each defendant's relationship to Grundy's network, however, varied considerably, as did the circumstances of each documented purchase. During the trial, Atwater also submitted another late motion to suppress. The district court denied it, as well.

The jury found all defendants guilty on all counts. All defendants were found guilty of Count 1, conspiracy to distribute drugs. Neville was also convicted of conspiring to launder a monetary instrument in connection with the seizure of more than $84,000 from Grundy's shipment of cash (Count 24), and Beasley was convicted on two counts of possessing methamphetamine with intent to distribute (Counts 16 and 17).

The district court imposed a life sentence on Grundy. Atwater was sentenced to 216 months; Beasley was sentenced to 216 months, Moseby to 240 months, and Neville to 360 months.

Vizcarra-Millan had pled guilty before the first trial. His attorney, Tennyson, submitted both a sentencing memorandum and a motion to withdraw his guilty plea. The district court held a hearing at which it first denied the withdrawal motion and then sentenced Vizcarra-Millan to 300 months in prison.

D. *Issues on Appeal*

On appeal, Grundy argues that the district court violated his Sixth Amendment right to counsel by unduly discouraging him from exercising his right to represent himself. Vizcarra-Millan contends that his right to counsel was violated by the district court's failure either to disqualify Tennyson or to grant his motion to withdraw his conflict waiver shortly before trial.

Atwater, Beasley, and Moseby appeal the district court's denials of their respective motions to suppress. Atwater argues that the search of his home was not supported by probable cause. Beasley moved to suppress the evidence seized during the traffic stop on the ground that the officers lacked reasonable suspicion that the driver had committed a traffic violation. Moseby objects to the government's seizure of his cell phones during the raid on Grundy's clubhouse and its search of those phones.

Finally, Atwater, Neville, and Beasley argue that the evidence did not support some of their convictions. All three say that the evidence at trial was insufficient to rule out the possibility that they were merely buyers from Grundy's gang, as opposed to co-conspirators. Neville also challenges his money-laundering conviction, and Beasley challenges his

conviction for constructively possessing the methamphetamine found at Koch's home.

In Part II, we address and reject first Grundy's and then Vizcarra-Millan's arguments that their Sixth Amendment rights to counsel were violated. In Part III, we affirm the denials of the motions to suppress filed by Atwater, Beasley, and Moseby. In Part IV, we address the sufficiency of the evidence for Atwater, Neville, and Beasley, affirming all convictions except two of Beasley's.

II. *Right to Counsel: Grundy and Vizcarra-Millan*

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right … to have the assistance of counsel for his defense." This constitutional command encompasses the accused's right to choose his own counsel, to have counsel free of conflicts of interest, and to choose to forgo counsel and to represent himself.

Grundy, by invoking his right to represent himself, and Vizcarra-Millan, by invoking his right to choose his own counsel despite a conflict of interest, each put the district court in a constitutional double-bind. No matter how a district court decides each issue, the defendant will have an issue to appeal. We have, for example, compared a district court's navigation of a request to proceed pro se to passing between Scylla and Charybdis, see *United States v. Sandles*, 23 F.3d 1121, 1127 (7th Cir. 1994), and similarly, "trial courts confronted with multiple representations face the prospect of being 'whip-sawed' by assertions of error no matter which way they rule." *Wheat v. United States*, 486 U.S. 153, 161 (1988); see also *United States v. Lowry*, 971 F.2d 55, 60 (7th Cir. 1992) (quoting same and encouraging district courts to consider the ramifications of joint-

representation disqualification rulings in light of the high constitutional stakes in either direction). We accordingly give considerable deference to the district court's decisions to the extent that they are subject to abuse-of-discretion analysis. We must also be mindful of the district court's front-row seat, which is especially relevant where a defendant deliberately seeks to sow ambiguity for a tactical advantage. See generally *United States v. Balsiger*, 910 F.3d 942, 952 (7th Cir. 2018).

A. *Grundy's Motion to Represent Himself*

Richard Grundy presents a claim under *Faretta v. California*, 422 U.S. 806, 819 (1975). He says that the district court's effort to ensure that his intended waiver of his Sixth Amendment right to counsel was knowing and intelligent went too far, effectively preventing him from exercising his *Faretta* right, a request that he ultimately withdrew.

As an accused defendant, Grundy had a Sixth Amendment right to represent himself: "The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Faretta*, 422 U.S. at 819. But any waiver of counsel in favor of self-representation must be knowing and intelligent. A pro se defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* at 835.

To establish a record, we strongly encourage district courts to conduct a formal hearing into whether the defendant is going into self-representation with "eyes open." Faced with a defendant invoking his right to proceed pro se, a district court should:

> engage in a thorough and formal inquiry with a
> defendant that probes his age, education level,
> and understanding of the criminal charges and
> possible sentences. The court should also in-
> form the defendant of the difficulties of pro-
> ceeding pro se.

*United States v. Johnson*, 980 F.3d 570, 577 (7th Cir. 2020) (quo-
tation marks and citations omitted). We are reluctant to police
too closely the details of district courts' *Faretta* hearings. The
district judge "is on the razor's edge in assisting a defendant
to make an informed choice between representation by coun-
sel with whom the defendant is irrationally dissatisfied and
self-representation." *United States v. Oreye*, 263 F.3d 669, 672
(7th Cir. 2001).[1]

This case illustrates this razor's edge. To ensure that a
waiver is "knowing and intelligent," the court should point
out the disadvantages of self-representation. If the court does
not say much about these challenges, defendants who waive
their right to counsel may argue on appeal that the *Faretta* col-
loquy was too cursory. E.g., *Johnson*, 980 F.3d at 577. But if the
district court goes into detail about these challenges, a defend-
ant who chooses in the end not to waive counsel may argue
on appeal that his *Faretta* rights were burdened by a colloquy
that was too persuasive. See *Sandles*, 23 F.3d at 1127. That's
part of the reason there is no "talismanic procedure" for
*Faretta* hearings, *Torres v. United States*, 140 F.3d 392, 401 (2d

---

[1] Formal hearings are not always necessary. We have affirmed find-
ings that a defendant constructively waived the right to counsel where the
record showed clearly that the defendant knowingly and intelligently
waived the right and understood the risks of going it alone. E.g., *Balsiger*,
910 F.3d at 953–54.

Cir. 1998), and why we generally review district court's *Faretta* hearings deferentially. E.g., *United States v. Hill*, 252 F.3d 919, 928 (7th Cir. 2001) ("Often asking the *Benchbook* questions may ensure that the defendant has his eyes open, but we do not read any of this court's decisions to hold that the litany is prescribed in every case or that advice about any particular disadvantage of self-representation is essential; such a reading would put us at odds with the Supreme Court."). The key is that the accused must make the final choice, but only once he understands his alternatives.

Nonetheless, as a matter of prudence if not constitutional law, district judges should discourage all or nearly all defendants from exercising their rights under *Faretta*. E.g., *Johnson*, 980 F.3d at 578 (commending judge for having "strongly advised Johnson against proceeding pro se"); *United States v. Mancillas*, 880 F.3d 297, 302 (7th Cir. 2018) ("courts 'should … advise the defendant that proceeding *pro se* is unwise.'"), quoting *United States v. Todd*, 424 F.3d 525, 531 (7th Cir. 2005); cf. *Kubsch v. Neal*, 800 F.3d 783, 812–16 (7th Cir. 2015) (affirming denial of habeas relief where petitioner argued that trial judge did not try hard enough to discourage him from representing himself in capital sentencing phase; defendant made competent strategic decision not to present evidence to mitigate three brutal murders, but to emphasize residual doubt about guilt), vacated on other grounds, 838 F.3d 845 (7th Cir. 2016) (en banc). The waiver of counsel must also be "unequivocal." That means that district courts must press difficult, hesitant, or ambivalent defendants to answer yes or no whether they wish to waive the right to counsel. See *United States v. Campbell*, 659 F.3d 607, 612 (7th Cir. 2011) (discussing importance of unequivocal demand and rationale for requirement), vacated on other grounds, 568 U.S. 802 (2012).

Turning to the facts here, seven days after the mistrial was declared in the Indianapolis trial, Grundy moved to represent himself. The district court held a *Faretta* hearing five days later. The court began by asking Grundy about his age, education, drug-use history, and general ability to read and understand evidence. The court informed Grundy of the charges against him and the long prison terms that could be mandatory if he were convicted. See *Johnson*, 980 F.3d at 577 (endorsing such advisements in *Faretta* hearing).

The bulk of the hearing was devoted to Grundy's request that his current attorney, Kenneth Riggins, be appointed standby counsel and to the data security problems posed by having a detained defendant with a track record of disregarding court orders seek unlimited access to confidential discovery within the jail. After discussing these issues for almost an hour, the court noted that if Grundy were to invoke unambiguously and unconditionally his right to proceed pro se, it would appoint attorney Riggins to have a limited role as standby counsel. The court also said it would likely require that Riggins retain physical possession of the most sensitive documents, though Grundy could review those documents with Riggins during jail visits.

The court finally asked Grundy for a yes-or-no answer. Grundy replied, "I guess I can't represent myself." He explained that it was a hard choice because he did not know how the district court would rule on future motions, including those pertaining to data security, whether the court might allow him to re-invoke his right to counsel, and how it would rule on a variety of late motions in limine he had contemplated filing.

On appeal, Grundy makes two distinct arguments. First, he says that the court was too persuasive during the *Faretta* hearing. Second, he says that the court should not have endorsed the government's suggestion that his access to confidential documents should be limited.

### 1. *Too Persuasive?*

We have suggested on occasion that a too-persuasive *Faretta* colloquy could burden the right. *Kubsch*, 800 F.3d at 812 ("If a judge believes, as the trial judge did here, that the defendant is making a knowing and intelligent waiver, then she would commit constitutional error by discouraging that decision too strongly."); *Oreye*, 263 F.3d at 672 (*Faretta* "right is not honored if judges must depict self-representation in such unremittingly scary terms that any reasonable person would refuse."), quoting *Hill*, 252 F.3d at 928–29; *United States v. Sandles*, 23 F.3d 1121, 1127 (7th Cir. 1994) (a too-persuasive colloquy risks "trammeling the defendant's constitutional right to present his own defense"). But Grundy does not cite, and we have not found, a case in which we have actually reversed a district court for dwelling on the "perils of self-representation … in truly loving detail." *Oreye*, 263 F.3d at 672. Instead, we "have tried to keep the permissible middle ground between these opposing errors fairly broad, allowing trial judges reasonable leeway to adapt the inquiry to the circumstances of the case without requiring a script or checklist." *Kubsch*, 800 F.3d at 813.

Grundy's hearing was dominated by prolonged discussions regarding his request to have his current attorney appointed as standby counsel. The district court responded that defendants who proceed pro se must represent themselves, and they cannot be co-counsel with their standby lawyers.

Grundy explained that he did not want attorney Riggins to be
co-counsel, but "just need[ed] him to be there to, like, help []
with the litigating parts and stuff like that." The district court
explained that that is not the job of standby counsel and, in
any event, a criminal defendant has no right to standby coun-
sel. See *United States v. Harrington*, 814 F.3d 896, 901 (7th Cir.
2016) (collecting cases; "a court has no obligation" to appoint
standby counsel).

The district court underscored that if Grundy were to pro-
ceed pro se, he would be truly on his own. Grundy later ex-
plained that he viewed standby counsel as "training
wheels"—someone who could help him organize his
thoughts, sort through the evidence, and consult throughout
the trial. To that end, he also wanted to have access to Riggins'
computer at the counsel table during trial so that he and Rig-
gins could quickly scroll through the electronic evidence.
Grundy's concerns were greater than the computer, though,
as he wanted "to be able to, to see what is about to happen
before it happens."

The court reiterated that it was concerned that Grundy en-
visioned an expansive role for Riggins. The court announced
that it would appoint Riggins as standby counsel but would
not tolerate hybrid representation (that is, the two working
together as co-counsel). The court again explained that trial
advocacy "is a highly technical involved area of education,
training, and understanding. I am not saying that to intimi-
date you. I am required by law to tell you that it is a hard thing
to do, but it is your absolute right to do it, and if that is what
you want to do, you have the right to do it." The court then
read from the Federal Judicial Center's *Benchbook*, which con-
tains a suggested script for *Faretta* hearings, strongly urging

Grundy not to try to represent himself. Grundy asked whether he could reverse course during trial. The court refused to deal with hypotheticals because it needed a "firm decision." Grundy balked at the phrase, "I am giving up my right" because he was concerned about the possibility that he could not re-invoke his right to counsel.

The district court's repeated questioning on Grundy's understanding of standby counsel did not run afoul of *Faretta*. We have explained that hybrid representation "is generally to be avoided," *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819, 826 (7th Cir. 2014), citing *United States v. Chavin*, 316 F.3d 666, 671–72 (7th Cir. 2002), if not outright "forbidden." *Oreye*, 263 F.3d at 672. As noted, before the district court could accept Grundy's waiver, it had to establish a record "that he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835 (quotation marks and citation omitted). As the foregoing summary illustrates, when Grundy at first said he wanted to waive his right to counsel, it was not clear whether he understood the consequences or understood that standby counsel is not co-counsel and that once he waived his Sixth Amendment right, he had no guarantee that the court would reappoint counsel if he later changed his mind.

We see no error in the district court's explanation of the limits of standby counsel, especially in the face of Grundy's repeated ambiguous answers as to what he wanted from his attorney. *Faretta* hearings "may require a give and take between the accused and someone trying to educate him about counsel's benefits." *Jean-Paul v. Douma*, 809 F.3d 354, 359 (7th Cir. 2015) (quotation marks and citation omitted). Here, Grundy repeatedly said that he wanted to have it both ways in trial *and* to be allowed to change his mind. That's a recipe

for trouble, and Judge Magnus-Stinson correctly acted to explain that hybrid representation was not possible and that she could not guarantee Grundy that he could change his mind later.

In a variation on this challenge, Grundy argues that the district court should have stopped the hearing about halfway through because he invoked his *Faretta* right clearly at that point. He contends that any further discussion burdened his right. But his argument both misreads the record and misunderstands *Faretta* and the purpose of the hearing. Grundy points to the following exchange after a fifteen-minute recess to discuss his options with his attorney:

> The Court: So you have had about 15, 20 minutes to talk to Mr. Riggins. I, before we—do you still want to proceed with the hearing on your motion to represent yourself?
>
> Grundy: Yes. I wanted to ask. I kind of got to the bottom of what I needed to know if I am going to represent myself or not.

Grundy asserts that this was an unequivocal invocation of his right to self-representation and that the hearing should have stopped then.

We disagree for two reasons. First, based on the transcript, this simply was not a clear invocation of his *Faretta* right. Rather, Grundy said only that he wanted to continue the conversation. See *United States v. Miles*, 572 F.3d 832, 836–37 (10th Cir. 2009) (affirming district court's interpretation of ambiguous statements as not expressing desire to proceed pro se). Second, and more fundamental, even a clear attempt to invoke *Faretta* is only the beginning of the matter, not the end.

The court was required to ensure that any waiver by Grundy of his right to counsel would have been knowing and intelligent. The court was not yet satisfied that it had established a record that Grundy understood that he would in fact be on his own and without Riggins' formal assistance. See *United States v. Campbell*, 659 F.3d 607, 612 (7th Cir. 2011) (where defendant clearly invokes right to proceed pro se, next step is for district court to engage in colloquy to address that request).

*Faretta* is not a *Miranda*-like right, where custodial interrogation must cease once a suspect says he wants a lawyer. See, e.g., *United States v. Wysinger*, 683 F.3d 784, 796 (7th Cir. 2012) (applying *Miranda*). When a defendant clearly and unambiguously invokes his *Faretta* right to proceed pro se, the district court is not required to take the statement at face value and as final. To the contrary, the district court *must* refuse to accept a supposed waiver until the record shows that the waiver is knowing and intelligent. Because Grundy remained ambivalent and tried to invoke his *Faretta* right conditionally, the court did not burden his right by asking further questions.

### 2. *Access to Evidence*

Grundy's second argument hinges on issues related to trial and witness security. He contends that the district court erred by asking the government for any input during the hearing and that the court's suggested conditions for data security burdened his constitutional rights. He points to the district court's suggestions that it would forbid him from taking possession of sensitive discovery materials (such as still-confidential witness statements), though he could review any and all documents with attorney Riggins, and that it might not allow Grundy to use Riggins' computer during the trial

itself. As we understand Grundy's argument on appeal, he says these conditions would have been unconstitutional if they had been imposed, so invoking them as a threat to coerce him into staying with his attorney violated *Faretta*.[2]

The district court correctly focused on the serious security concerns posed by Grundy's prosecution. The right to represent oneself "is not unlimited," and "[s]ecurity considerations … may require special adjustments." *Milton v. Morris*, 767 F.2d 1443, 1446 (9th Cir. 1985), citing *United States v. Chatman*, 584 F.2d 1358, 1360 (4th Cir. 1978) (no constitutional violation where defendant's access to legal resources was restricted after being moved into "segregated confinement"); see also *United States v. Galloway*, 749 F.3d 238, 242 (4th Cir. 2014) (no constitutional violation where district court's discovery orders inconvenienced pro se defendant because they were "justified by the circumstances," that is, "enormous security issues"); *United States v. Sarno*, 73 F.3d 1470, 1491–92 (9th Cir. 1995) ("The right of access is not unlimited, but must be balanced against the legitimate security needs or resource constraints of the prison;" no constitutional violation where government allowed defendant to review discovery to determine which documents should be copied for his pretrial

---

[2] Circuits have reached different answers about the extent to which a pro se defendant in custody has a constitutional right to government assistance in his defense, and about where to find such a right in the Constitution. See *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005) (per curiam) (noting split and reversing grant of habeas relief because state-court determination that pro se defendant was not entitled to law library access was not contrary to clearly established federal law: "*Faretta* says nothing about any specific legal aid that the State owes a pro se criminal defendant."). We need not deepen the split here because Grundy's claim fails for reasons explained in the text.

preparation—but gave him only 20 hours to inspect 250,000 pages of material); *United States v. Bisong*, 645 F.3d 384, 396 (D.C. Cir. 2011) (quoting same and expressing skepticism that pro se defendants have any Sixth Amendment right to discovery in preparing their defense).

Recall the context of this hearing. The district court, already alert to the grave security concerns in the case, had taken the unusual step of empaneling an anonymous jury based on concerns about juror intimidation. The first trial ended in a mistrial, in part because Grundy himself obtained confidential juror questionnaires. The transcript of the *Faretta* hearing also indicates that he was placed in solitary confinement as a result of the conduct that led to the mistrial.[3]

Given this backdrop, Grundy posed obvious and legitimate security concerns, even with counsel. If he were to represent himself, the district court had to consider further potential problems. Judge Magnus-Stinson's discussion of potential solutions was important and responsible. A core part of the district judge's job is to protect jurors, witnesses, and the integrity of judicial proceedings more broadly. Consideration of these proposals was entirely appropriate under the circumstances. Discussion of them did not violate Grundy's constitutional rights.

---

[3] Though the district court did not discuss it at the hearing, Grundy had a hand in producing a song called "COS [Code of Silence] (Ain't No Tellin)." The lyrics instruct to "close your mouth for the feds" because people who cooperate with the police are "better off dead." The accompanying music video, which features Grundy, includes graphic fictionalized depictions of what happens to people who "rat" on the gang. (They are murdered.)

Grundy's argument also faces a threshold problem. Since he declined to proceed pro se, we do not know what steps the district court would actually have taken. In reviewing the court's statements, we do not adopt the least charitable reading possible. The court told Grundy that if he chose to proceed pro se, they could "figure something out," and we do not assume that the district court would have done so unreasonably or in bad faith.

At least some arrangements like the proposed restrictions would have been warranted by the unusual circumstances of Grundy's prosecution. The government requested that Riggins, as standby counsel, retain physical possession of certain sensitive documents, though Grundy and Riggins would be allowed to review them together. As it mulled its options, the court made clear that under any scenario, it would not forbid Grundy from viewing any document, but it had legitimate security concerns about Grundy taking confidential witness statements into the jail. Grundy's solitary confinement may have made this process cumbersome, but we are not convinced that approach would have been per se unconstitutional or even an abuse of discretion. See *Chatman*, 584 F.2d at 1360 (restricting a particularly dangerous defendant's access to legal materials did not violate *Bounds*); *Galloway*, 749 F.3d at 242 (affirming limits on pretrial detainee's access to discovery in light of security concerns).

Grundy also objects to the court's comments on his request to use Riggins' computer during trial if he waived counsel. We see no error. The court merely noted that it would "figure something out" if Grundy chose to proceed without counsel. In any event, Grundy's request was ambiguous. Putting aside the ethical and security issues posed by a court ordering a

defense attorney to give one client access to all his files, it is not even clear that Grundy wanted a computer as such. On follow-up questioning, he explained, "I would like to be able to, to see what is about to happen before it happens." As the district judge noted, Grundy's comment was more likely an observation about the benefits of having the guiding hand of experienced counsel.

To sum up on this issue, the court's *Faretta* hearing was procedurally sound, and its discussion of possible restrictions on access to confidential documents due to security concerns did not violate the Constitution. We affirm Grundy's conviction.

B. *Vizcarra-Millan's Potentially Conflicted Counsel*

Vizcarra-Millan's appeal attempts to take advantage of the inherent tension between two aspects of the accused's Sixth Amendment right to counsel: the right to counsel of one's choice and the right to counsel who is free of conflicts of interest. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (denial of counsel of choice is a structural error; reversal does not require showing of prejudice); *Wheat v. United States*, 486 U.S. 153, 159-60 (1988) (right to counsel free of conflicts); *United States v. Turner*, 594 F.3d 946, 955 (7th Cir. 2010) (reversing conviction following trial where district court had disqualified defendant's preferred counsel too readily in face of potential conflict).

If the accused says he wants to be represented by a lawyer who faces an actual or potential conflict of interest, the district court can err in either direction: either deny the accused his choice of counsel or deny him counsel free of conflicts of interest. This tension also can create opportunities for

manipulation by unscrupulous counsel or a defendant who faces overwhelming evidence of guilt. See *Wheat*, 486 U.S. at 161. District courts therefore have broad discretion in how to handle this constitutional balancing act. To complicate matters further here, Vizcarra-Millan seemed to change his mind over the course of the case.

To begin, we review the facts of the two hearings where Vizcarra-Millan waived his right to conflict-free counsel and explain why we find no error at that stage. We then consider Vizcarra-Millan's change of position a few weeks before trial, when he tried to revoke his waiver of his right to conflict-free counsel. The district court rejected this change of course and found that he was acting in bad faith, which Vizcarra-Millan essentially admitted at sentencing. We also find no reversible error in the court's handling of his change of mind.

1.  *Vizcarra-Millan's Waivers of the Right to Conflict-Free Counsel*

    a.  *The Problem Arises Before Judge Barker*

Defendant Gilberto Vizcarra-Millan hired a conflicted attorney, John Tennyson, to represent him. Tennyson had two other clients in the Grundy gang, and both had agreed to testify for the government. The government informed Judge Barker that attorney Tennyson represented several defendants in two Grundy-related cases—Carroll and Carter in one case, and Vizcarra-Millan in the other. When Judge Barker learned of this conflict, she promptly held a hearing to determine whether Vizcarra-Millan and the other defendants knowingly and intelligently waived the right to conflict-free counsel and whether she should nonetheless disqualify Tennyson based on the conflict.

Judge Barker explained that a hearing was necessary because Vizcarra-Millan "intends to proceed to trial," and Carroll and Carter had agreed to testify for the government. The judge summarized the facts: Carroll and Carter were part of Grundy's drug-distribution network in Indianapolis. They knew generally that the drugs came from Arizona, but they did not know that Vizcarra-Millan was the source in Arizona. Their testimony would implicate Vizcarra-Millan only indirectly. Tennyson suggested that he would not cross-examine either Carroll or Carter except to ask whether they knew Vizcarra-Millan or knew the source of the drugs, to which they would reply no.

Skeptical that Tennyson or the government could guarantee exactly how two cooperating witnesses would testify at trial, Judge Barker observed that, given these conflicts, "it seems so obvious to me … that you're on thin ice." Nonetheless, she conducted a full colloquy to inform each of Tennyson's clients of his right to conflict-free counsel and the dangers of proceeding with Tennyson. All three clients orally waived their right to conflict-free counsel. Carroll and Carter both told law enforcement that they did not know Vizcarra-Millan. The government agreed that neither witness had suggested any knowledge that would implicate Vizcarra-Millan directly. Tennyson also noted that he expected other trial evidence to establish clearly "a very strong Arizona connection," so that he would not contest the general geographic source of the drugs at trial.

Judge Barker then discussed the potential conflict with Vizcarra-Millan. She noted that it was unlikely to be "serious" and that it was "not a substantive issue where there's a direct obvious conflict." She then told Vizcarra-Millan of his right to

conflict-free counsel. He said that he waived that right and wanted to continue with attorney Tennyson. Judge Barker also ordered Tennyson to file written waivers, and she issued a written order observing that disqualification was not yet necessary given the limited nature of the conflict and Vizcarra-Millan's knowing and intelligent waiver. The order also observed that limiting measures short of disqualification might effectively remedy any future conflict.

Judge Barker handled the issue exactly right. She examined the nature of the potential conflict closely and concluded correctly that the potential conflict was not very serious or important as a practical matter. She also noted that if the potential conflict became actual, measures short of disqualifying counsel could protect Vizcarra-Millan's rights. Judge Barker did not abuse her discretion by deferring to Vizcarra-Millan's informed choice to stick with attorney Tennyson. As noted, it is risky to disqualify counsel over the objection of the accused, especially where the conflict remains only potential, because denial of the right to counsel of choice can also violate the Constitution. *Gonzalez-Lopez*, 548 U.S. at 150; see also *Turner*, 594 F.3d at 955 (reversing conviction following trial where district court had disqualified counsel too readily in face of potential conflict).

b. *The Second Hearing, Before Judge Magnus-Stinson*

Judge Magnus-Stinson took over the conflict issue when the two cases were consolidated. She ordered Tennyson to submit written waivers. When he did not, Judge Magnus-Stinson held another hearing on February 19, 2019 on whether Vizcarra-Millan knowingly and intelligently waived his right to conflict-free counsel. At the hearing, he explained that he "got to kind of thinking" after the first hearing. Judge

Magnus-Stinson reiterated that he had an absolute right to conflict-free counsel, and that, based on the initial hearing before Judge Barker, it sounded as if Tennyson could not guarantee the absence of a conflict and that, at a minimum, Tennyson's other clients would likely implicate him indirectly through the Arizona connection.

Vizcarra-Millan's argument on appeal hinges on what happened next. He told the judge that he was "kind of stuck in a hard position" because he had already paid Tennyson in full and did not want to have to restart with a new attorney with trial just a few months away. Vizcarra-Millan then blamed the government for the "unfair" and "tough" position he was in. The court responded that it was not the government's fault that he had retained Tennyson, but nonetheless observed that it did not sound as if he wanted to waive the conflict. Vizcarra-Millan expressed ambivalence about whether he wanted to waive his conflict with Tennyson, but he then announced for the first time that he did not want to take the case to trial.

The government provided background as to why plea negotiations had broken down. Tennyson and Vizcarra-Millan had met with the government for a proffer session. During that meeting, the prosecutors learned that he had never signed the written waiver as ordered by Judge Barker. At the hearing before Judge Magnus-Stinson, the government expressed no preference for or against Tennyson and waiver but noted that it could not be confident it could make a valid plea agreement where it was unclear whether Vizcarra-Millan's counsel actually represented him and could properly represent him:

> If he wants to sign the form and waive the con-
> flict and proceed with Mr. Tennyson, I am fine
> working with Mr. Tennyson. If he wants a new
> lawyer, I am fine with working with a new law-
> yer, but I am not going to negotiate a plea agree-
> ment or someone's cooperation under this pos-
> ture.

The judge turned the choice back to Vizcarra-Millan. After a hearing and a half, he knew the stakes and the facts. He responded: "I don't mind waiving my right. I don't mind waiving it. I don't mind waiving it." He then complained that the prosecutor did not help him "in any type, shape, form, or way," even in response to the proffer.

The judge correctly observed that this was not an unequivocal waiver, so she pressed Vizcarra-Millan to answer yes or no whether he wanted to continue with his waiver. The judge then went off the record for almost twenty minutes while Vizcarra-Millan discussed the issue with Tennyson. Following that conversation, he clearly and unequivocally waived his right to conflict-free counsel. He later filed a written waiver of his right to conflict-free counsel.

On appeal, Vizcarra-Millan argues that his waiver was invalid because it was not knowing, intelligent, voluntary, and unequivocal. See *United States v. Hill*, 252 F.3d 919, 923–24 (7th Cir. 2001). We review that question de novo, though we defer to the credibility determinations of the district court. *United States v. Balsiger*, 910 F.3d 942, 952 (7th Cir. 2018). Based on this record, there is no question that Vizcarra-Millan's waiver met these criteria. We defer to both Judge Barker's and Judge Magnus-Stinson's determinations that he understood the hearings. His comments in both hearings show that he

understood what was happening. There is no hint that the government coerced the waiver. To the contrary, the government was agnostic about his decision. And finally, though Vizcarra-Millan was ambivalent about joint representation at the beginning of the second hearing, he cleared up any ambiguity by the end of the hearing. To the extent he argues now that Tennyson misled him during the off-the-record break, two different federal judges concluded that Vizcarra-Millan understood what was happening and what the stakes were, so no further colloquy would have been necessary. See *Turner*, 594 F.3d at 952 n.1 (emphasizing minimal procedural requirements for hearings on waiver of conflict-free counsel).

Vizcarra-Millan also argues that the red flags in Tennyson's representation should have caused the court to disqualify Tennyson despite his own waiver and his invocation of his right to counsel of choice. Such a step would have invited appeal based on denial of his right to counsel of choice, as in *Turner*, 594 F.3d at 948 (reversing where district court disqualified defendant's counsel of choice based on potential conflict of interest). The fact that Tennyson was "up to [his] elbows" in conflicts, as Judge Barker put it, might have *permitted* the court to override the defendant's choice, but he has not shown that judicial override of his choice was *required*.

The question on appeal is whether Judge Magnus-Stinson's decision to accept the second waiver was within the wide band of discretion that district court judges have when facing such a dilemma. It was. While disqualification of the defendant's counsel of choice over his objection might have been permissible here under *Wheat*, it would have produced a sure-fire issue for an appeal, especially in light of both Tennyson's and Vizcarra-Millan's statements minimizing the

seriousness of what seemed like only a minor potential con-
flict that could, if necessary, be managed by steps short of dis-
qualification. See *United States v. Gearhart*, 576 F.3d 459, 465
(7th Cir. 2009) (collecting examples of creative evidentiary so-
lutions to avoid conflicts); *United States v. Turner*, 651 F.3d 743,
750 (7th Cir. 2011) (citing same).[4]

### 2.  *Vizcarra-Millan Changes His Mind*

After Vizcarra-Millan submitted his written waiver, the
parties went back to the negotiating table but were unable to
reach an agreement. On May 2, 2019, Tennyson reported at a
status conference that Vizcarra-Millan would proceed to trial.

Three weeks later, and just five weeks before trial, Tenny-
son filed a motion seeking to withdraw Vizcarra-Millan's
waiver of the right to conflict-free counsel. The motion was
terse. It recited the procedural history and said: "The Defend-
ant no longer wishes to waive his right to conflict-free repre-
sentation because plea negotiations have broken down." It
added that Vizcarra-Millan "felt pressured into executing the
waiver because the Government would not negotiate with
him while the issue of whether he would sign a joint repre-
sentation waiver was pending."

---

[4] Much of Vizcarra-Millan's argument against the validity of his sec-
ond waiver seems to preview a future argument that he did not receive
effective assistance of counsel during plea negotiations. His primary com-
plaints about Tennyson do not concern the joint representation issue with
Carroll and Carter. Rather, he questions Tennyson's overall competence
as an attorney and the adequacy of representation he provided in this case.
But the overall record of Tennyson's representation is not before us, and
we express no opinion on the subject. See *United States v. Flores*, 739 F.3d
337, 340–41 (7th Cir. 2014) (explaining why we discourage defendants
from bringing ineffective assistance claims on direct appeal).

After briefing but without a hearing, the district court denied the motion. The court analogized Vizcarra-Millan's oral and written waivers to guilty plea colloquies and suggested that he not be able to recant his sworn testimony without *some* reason. It stressed that Vizcarra-Millan's motion was flatly inconsistent with the oral and written representations both he and his lawyer had made throughout the case. The court concluded that Vizcarra-Millan sought to use his counsel's conflict of interest as a "bargaining chip in plea negotiations." The court also found his "eleventh-hour" motion to be "suspect" because Vizcarra-Millan had rejected the government's plea offer over three weeks before the motion to withdraw the waiver was filed, and at that hearing, the court underscored the logistical challenges that the trial would pose. The court, in other words, viewed the motion as a last-minute gambit to postpone the joint trial.[5]

---

[5] In the end, though, the district court disclaimed reliance on any logistical or calendar problems that could be posed by granting a continuance to allow replacement counsel to get up to speed, though it found such concerns to be "notable." See *Gonzalez-Lopez*, 548 U.S. at 152 (noting district court's wide latitude in considering calendar concerns). Vizcarra-Millan's attempt to compare the timing of his motion to instances where we have held that a court abused its discretion in denying such a motion even closer to trial is thus misplaced. The district court did not deny his motion to withdraw on that ground. We note, however, that these are highly fact- and context-specific issues, and there is no hard timing cutoff. See *United States v. Sellers*, 645 F.3d 830, 836 (7th Cir. 2011) ("[W]e look at the whole of the circumstances surrounding the last minute filing."). If the district court had granted Vizcarra-Millan's motion, the other trial defendants would have had to sit in jail, their day in court postponed for months until replacement counsel could make it through the mountains of discovery, to say nothing of witnesses' fading memories or weakening resolve to

The district court focused most of its analysis on the fact that both Tennyson and Vizcarra-Millan had long been aware of this potential conflict of interest. The May 27 motion to withdraw his waiver argued that the likelihood that Vizcarra-Millan would go to trial would create a new conflict, but that possibility had always been on the table. Judge Barker's hearing back in October 2018 was premised on Vizcarra-Millan going to trial, and the parties discussed in detail what such a trial might look like. Tennyson offered suggestions as to how to avoid or manage the conflict if it arose. Judge Barker noted other options in her order approving the waiver. Vizcarra-Millan was present for all of that. Two federal judges observed him through two hearings discussing the conflict of interest and potential for trial problems, and both thought that he understood the issue and voluntarily chose to waive the potential conflict.

Vizcarra-Millan has two principal arguments for reversing based on the denial of these motions. First, he argues that the court made a procedural error by ruling on his first motion without holding a hearing. At the very least, he says, the court's failure to hold a hearing should call for de novo review of the denial. Second, he says that the court erred substantively because, if a defendant objects to conflicted counsel before trial, it is a per se constitutional violation to make him proceed to trial. In the alternative, he argues that the district court held him to too high a standard for withdrawing his waiver.

---

testify against the conspirators. It would not have been an abuse of discretion to deny Vizcarra-Millan's motion on these grounds, too.

### a. *Need for Another Hearing?*

As a general rule, an opportunity to be heard face-to-face can improve the accuracy of decision-making and ensures a sense of fairness and legitimacy in the process. See generally *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 161–74 (1951) (Frankfurter, J., concurring). Perhaps another hearing might have sharpened the district court's decision-making and aided our review, but we are not convinced that yet another hearing was essential here.

In challenging the denial without a hearing, Vizcarra-Millan relies on our cases involving motions to replace appointed counsel due to a lack of communication between client and counsel preventing an adequate defense. E.g., *United States v. Jones*, 844 F.3d 636, 642 (7th Cir. 2016). In such cases, we review for an abuse of discretion when a defendant has "had an opportunity to explain his reasons for requesting substitute counsel." *Id.* We weigh "the timeliness of the defendant's motion, the adequacy of the district court's inquiry into the motion, and whether the conflict resulted in a total lack of communication preventing an adequate defense." *Id.*

Another hearing was not essential in this case. The importance of a hearing on issues of replacing counsel is based on two assumptions that do not apply here. First, a motion for substitution may be the first time that the district court becomes aware of the conflict or tension between attorney and client. *Zillges*, 978 F.2d at 371–72; see also *United States v. Ryals*, 512 F.3d 416, 418 (7th Cir. 2008) (reversing denial of motion for substitute counsel for sentencing). Second, where there has been a "total breakdown in communication," an in-person hearing where a defendant can explain himself or herself serves an important purpose. With an asserted breakdown in

communication, the court should not necessarily assume that counsel has described the problem accurately. See *Ryals*, 512 F.3d at 419–20 (defendant cannot be blamed because counsel described tension inadequately); *United States v. Morrison*, 946 F.2d 484, 498–99 (7th Cir. 1991).

Neither of those concerns was present here. First, the district court had already held two hearings on the same issue. Everyone knew what the issues and concerns were. To be sure, a hearing would have allowed the district court to probe why Vizcarra-Millan's thinking had changed, but it was not necessary to understand the fundamental issues in Tennyson's motion. See *United States v. Bjorkman*, 270 F.3d 482, 501 (7th Cir. 2001) ("even without [a] hearing the court may well have been sufficiently apprised of the nature of Bjorkman's complaints to rule on his request" where defendant's letter provided some detail); see also *United States v. Miller*, 405 F.3d 551, 557 (7th Cir. 2005) (applying abuse-of-discretion review where district court held hearing "*after* it denied the request"). Thus, we review for abuse of discretion.

Second, the conflict at issue did not implicate Tennyson's ability to convey or fulfill Vizcarra-Millan's wishes. The conflict was the same one that had been discussed all along. If Vizcarra-Millan were to go to trial, Carroll might testify that the drugs came from Arizona, and Tennyson would have to limit his impeachment of Carroll, also his own client, on that fact. Nothing about that conflict suggested that Tennyson was unable to represent Vizcarra-Millan, let alone that he could not present an adequate defense or describe the issue adequately.

### b. *Rejecting the Change of Mind*

Turning to Vizcarra-Millan's substantive challenges to the denials, the general rule is that if there is no waiver, "whenever a trial court improperly requires joint representation over timely objection reversal is automatic." *Holloway v. Arkansas*, 435 U.S. 475, 488 (1978). That general rule does not apply here because Vizcarra-Millan did waive his right, knowingly and voluntarily, and the case had proceeded for months in reliance upon that waiver. District courts are entitled to treat such waivers as binding. *United States v. Roth*, 860 F.2d 1382, 1387 (7th Cir. 1988) ("A judge is entitled to hold a defendant to statements made in open court and need not give him a hearing so that he may more readily contradict himself."). At least for the reasons we have described with the constitutional double-bind, we review only for an abuse of discretion a district court's refusal to allow the withdrawal of a valid waiver.

Vizcarra-Millan's evident bad faith supported denial of his attempt to withdraw his waiver. District courts have discretion to deny bad-faith attempts to manipulate judicial proceedings or to undermine the integrity of the judicial process. See, e.g., *United States v. Fazzini*, 871 F.2d 635, 643 (7th Cir. 1989) (district court did not err in refusing to inquire into well-documented about-face regarding pro se representation); *United States v. Thibodeaux*, 758 F.2d 199, 201 (7th Cir. 1985) (defendant "may not manipulate his right to counsel to undermine the orderly procedure of the courts or subvert the administration of justice" by filing dilatory and contradictory motions regarding appointed counsel); cf. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151–52 (2006) (listing instances

where courts weigh right to counsel against case and court management).

Judge Magnus-Stinson soundly rejected Vizcarra-Millan's attempt to blame the prosecutor for forcing him into this supposed corner. At the February 2019 hearing, the government had said it had no preference for or against Tennyson. The problem in the plea negotiations was that Vizcarra-Millan's strategic ambiguity in orally waiving his right without signing a written waiver had made it impossible to know whether Tennyson was truly authorized to negotiate on his behalf. Until that question was resolved definitively, plea negotiations would have been a waste of time.

Vizcarra-Millan argues more generally that a district court is not allowed to deny a motion to withdraw a waiver of a constitutional right out of spite, and that applying any heightened standard is suspect. He says that the district court should not have required him to show changed circumstances justifying his about-face. He also analogizes his case to others in which we have criticized district courts for failing to accommodate other motions to substitute counsel even closer to trial. See, e.g., *Sellers*, 645 F.3d at 838.

Vizcarra-Millan is correct that timing is often central when a district court denies a motion to change counsel. Where he veers off course, however, is misunderstanding the multiple ways in which timing may be relevant. It's not only a matter of logistics, even if logistics alone would have justified denial of his about-face here. As the Fifth Circuit has noted, a district court can deny such a motion if the defendant "was attempting to abuse his rights to achieve some mischief" or if "granting his request would have interfered in any way with … calendaring." *United States v. Taylor*, 933 F.2d 307, 311 (5th Cir.

1991); see also *United States v. Leveto*, 540 F.3d 200, 207 (3d Cir. 2008) ("Certainly, evidence of a defendant's dilatory motive is properly considered as a basis for denial. Moreover, particularly as the trial date draws nearer, the district court can and should consider the practical concerns of managing its docket."). In short, a defendant "may not manipulate his right to counsel to undermine the orderly procedure of the courts or subvert the administration of justice." *United States v. Balsiger*, 910 F.3d 942, 954 (7th Cir. 2018), quoting *Thibodeaux*, 758 F.2d at 201.

The court did not clearly err in finding that Vizcarra-Millan acted in bad faith. Judge Magnus-Stinson observed Vizcarra-Millan in his second waiver hearing and later proceedings, and she concluded that the new attempt to revisit the conflict issue was just a ploy. Everyone, including Vizcarra-Millan, knew there were easy ways to work around this potential conflict. Based on the well-documented history of Vizcarra-Millan's waiver, including his initial attempt to hold out on signing the waiver in an attempt to sow strategic ambiguity, we see no error in Judge Magnus-Stinson's findings or her denial of Vizcarra-Millan's pretextual motion.

Even if there were doubt about Vizcarra-Millan's bad faith before trial and his guilty plea, the doubt would have been erased at sentencing. After the court denied Vizcarra-Millan's waiver, he pled guilty without a plea agreement. The court's plea colloquy was the "most thorough, most pointed" the attorneys had ever seen. Nonetheless, on the eve of sentencing, Vizcarra-Millan, through Tennyson, moved to withdraw his guilty plea. The judge gave him an opportunity to explain his actions throughout the litigation. He admitted that he had created ambiguity in whether he had waived his right to conflict-

free counsel so as to keep his options open. In other words, he admitted that he had effectively misled the court in his sworn Rule 44 colloquy. He also claimed that he had not understood the plea colloquy and therefore should be released from his plea.

Judge Magnus-Stinson was not impressed:

> So I know you are trying to figure out an angle to get yourself off the hook that you are on, but you are on the hook is what I am telling you to-day. And so the Court will deny any request to withdraw the plea of guilty in this case. Because just for the record, I think you will say whatever you can to try to get out of it….

Vizcarra-Millan says that we should not credit his state-ments at sentencing because they were tainted by the court's earlier denial of his motion to withdraw his waiver. We do not follow his logic. As noted, we review the district court's bad-faith finding for clear error. The court found that he was mo-tivated by the desire to use the strategic revocation of his waiver as a bargaining chip in plea negotiations. He admitted at sentencing that he had done exactly that.

The district court therefore did not abuse its discretion in denying Vizcarra-Millan's motion as made in bad faith. Dis-trict courts are entitled to rely on "the representations of the defendant, his lawyer, and the prosecutor…. Solemn declara-tions in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977); *United States v. Roth*, 860 F.2d 1382, 1387–89 (7th Cir. 1988) (holding defend-ant to earlier waiver of right to conflict-free counsel). Tenny-son and Vizcarra-Millan's about-faces gave the court a choice.

It could either reward their gamesmanship by allowing their "transparent ploy for delay," *Morris v. Slappy*, 461 U.S. 1, 13 (1983), or it could conclude that, in the interest of fair and orderly administration of justice, they would have to stand by their repeated solemn declarations.

Contrary to Vizcarra-Millan's arguments, the district court did not ignore the Sixth Amendment stakes. Tennyson's conflict was only potential and narrow. Carroll's anticipated testimony that the drugs came from Arizona was simply not much of an issue for the government or Vizcarra-Millan. Tennyson and Vizcarra-Millan conceded as much. Carroll did not testify about it at trial. The record was clear that any conflict at trial could have been mitigated in any number of ways so that it never would have required disqualification. Tennyson and Vizcarra-Millan discussed those options in open court.

Finally, Vizcarra-Millan argues that he should not be blamed for having hired an unethical and unscrupulous lawyer. He was taken advantage of, he says, and did not waive his rights or seek to revoke that waiver in bad faith. He would rather we focus on Tennyson's misconduct in soliciting joint representation without obtaining written waivers as required by the Indiana Rules of Professional Conduct. He did so while reaching out directly to represented clients, again in violation of the Indiana Rules of Professional Conduct. He was held in contempt of court for failing to abide by court orders. His license to practice law was briefly suspended in Tennessee.

This is a troubling story, but it should not distract us from Vizcarra-Millan's conduct. The district court inferred (and he admitted) that from the very early stages of this case, he deliberately tried to sow ambiguity about his waiver. He then continued to use Tennyson's potential conflict as a wedge to

secure a better plea deal. Whether Tennyson committed further ethical misconduct, whether his performance fell below the constitutional minimum, and whether Vizcarra-Millan might have been prejudiced by any such failure are questions that are not properly before us. We affirm Vizcarra-Millan's conviction.

III. *Fourth Amendment Issues*

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Defendants Atwater, Beasley, and Moseby all filed late motions to suppress evidence gathered against them, each claiming that a different facet of the Fourth Amendment was violated. Atwater's house was searched pursuant to a warrant. He argues that the warrant was not issued "upon probable cause." Beasley argues that the pretextual traffic stop leading to discovery of methamphetamine on his person was an "unreasonable seizure" because the officers did not actually observe a traffic violation. Moseby's cell phones were seized and searched pursuant to a warrant authorizing federal agents to seize and search all cell phones found in Grundy's clubhouse. Moseby argues that, given the unique privacy interests in cell phones, the warrant was too broad to justify seizure and search of his cell phones.

A.  *Timeliness of the Motions and Beasley's Motion to Suppress*

The government asks us to affirm the district court's denials of all three motions as untimely. Per the district court's scheduling order, motions to suppress were due in February 2019. All three defendants' motions were filed months later, two in the days preceding trial and the third actually during trial.

"If a party does not meet the deadline for making a [motion to suppress], the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3). "If the defendant also fails to file a motion for relief showing good cause before the district court, then we apply a hyper-deferential standard of review in which we examine whether, *if* a motion for relief had been made *and* denied, the district court *would have* abused its discretion in concluding that the defense lacked good cause." *United States v. Adame*, 827 F.3d 637, 647 (7th Cir. 2016) (quotation marks and citation omitted).

At least two, if not all three, motions to suppress could have been denied on procedural grounds as untimely under Rule 12. Neither Atwater nor Beasley tried to show good cause before the district court. Moseby's late motion tried to establish good cause, and the district court did not rule on that question. Although Rule 12 is mandatory, it is not jurisdictional, *United States v. Nixon*, 901 F.3d 918, 921 (7th Cir. 2018), and we may affirm the district court on any ground supported by the record. *United States v. Harden*, 893 F.3d 434, 451 (7th Cir. 2018). Because the district court addressed the merits of

each defendant's suppression motion, we do the same for At-
water's and Moseby's respective motions.[6]

Beasley's motion, however, presented a question of fact,
and the district court did not hold a hearing with in-person
testimony. Recall that Susan Koch and Beasley drove in her
car to buy some methamphetamine. Local police knew about
the deal and stopped their car soon after the deal had been
completed. Beasley's motion to suppress asserted that the of-
ficers did not have reasonable suspicion for the seizure be-
cause they did not actually observe a traffic violation. See, e.g.,
*United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019). He
then argued that the 120 grams of highly pure methampheta-
mine that were found on him and served as the basis of his
conviction for Count 16 should have been suppressed.

Beasley's motion thus attacked the credibility of the offic-
ers who made the stop. One group of officers said Koch
swerved out of her lane over a double yellow line. Another
group of officers said Koch drove 50 miles per hour in a 35
mile-per-hour zone. Beasley claimed that a hearing would
show that the stop violated the Fourth Amendment. The gov-
ernment said that Koch was simply driving erratically and
two sets of officers saw her commit different violations in dif-
ferent places.

So did the officers actually see one or both violations?
Were they honestly mistaken? Was one group of officers ly-
ing? Were both? Neither? These questions are fact-intensive
and would have required weighing witness credibility. E.g.,

---

[6] Ruling on the substance of such motions can avoid later claims for
ineffective assistance of counsel premised on motions that would not have
prevailed.

*United States v. Rodriguez-Escalera*, 884 F.3d 661, 672 (7th Cir. 2018) (affirming grant of motion to suppress based on credibility findings). The district court denied Beasley's motion on the twin grounds that it was untimely and that the motion did not cleanly tee up a material factual dispute that would justify a hearing at that late juncture.

Even on appeal, Beasley does not identify good cause for his late motion, and no justification is apparent from the record. We accordingly affirm the district court's denial of his motion to suppress as untimely. See *Adame*, 827 F.3d at 647. We do not reach the merits or the need for a hearing.

B.  *Atwater's House*

Atwater argues that the evidence of drug possession and distribution uncovered during a search of his home should be suppressed because the warrant justifying the search was not supported by probable cause. The warrant application provided facts showing that Atwater was a drug dealer, that a specific residence was likely his house, and that based on those facts, in the experience of the affiant, it was likely that he had drugs or evidence of dealing in the home. Atwater claims that the evidence showing that the house was his was too sketchy and that any inference that he kept drugs or other evidence of dealing there was too speculative.

An affidavit submitted in support of a warrant application "need only contain facts that, given the nature of the evidence sought and the crime alleged, allow for a reasonable inference that there is a fair probability that evidence will be found in a particular place." *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010). Probable cause is a common-sense standard,

and we give deference to an issuing judge's assessment. E.g., *United States v. Bacon*, 991 F.3d 835, 840 (7th Cir. 2021).

We have recognized that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991), quoted in *United States v. Zamudio*, 909 F.3d 172, 176 (7th Cir. 2018). Thus, where an affidavit offers reasonable grounds to believe the target is a drug dealer and that the property to be searched is his or her residence, we defer to an issuing judge's determination that the warrant application established probable cause to search the residence. *Zamudio*, 909 F.3d at 176–77.

Here, the warrant affidavit said that Atwater bought wholesale quantities of methamphetamine several times in quick succession. He bought, for example, two ounces on July 27, 2017; one ounce on August 6, 2017; and twelve ounces on August 10, 2017. These were quantities of methamphetamine consistent with retail drug distribution. Atwater alleges that the information was stale because these purchases were three months old. It is true that a warrant based on the prior possession of consumable or fungible goods may be stale if too much time has passed before the search is executed. But here, the repeated and large purchases suggested ongoing activity, i.e., retail drug distribution. Given the affiant's experience that retail drug dealers keep drugs in their home, that was enough to support a finding of probable cause. *Id.* at 176–77; see also *United States v. Pless*, 982 F.2d 1118, 1126 (7th Cir. 1992) (three-month-old information about methamphetamine laboratory was not stale, and even if it had been, officers relied on warrant in good faith).

That brings us to Atwater's second issue: the evidence that he lived at the place to be searched. The warrant application

explained that he subscribed for utility services at the address, that cell-site location information placed him (or at least his cell phone) there a majority of the time, and that surveillance placed him there twice in the week preceding the warrant application. That was enough to support the magistrate judge's common-sense determination that there was a reasonable probability that Atwater lived there and that the police would find drugs or other evidence of drug-dealing there.

C. *Moseby's Cell Phones*

Moseby's cell phones were seized during a search of one of Grundy's properties, the "clubhouse" for his gang. Moseby claims that the search warrant was overbroad in allowing the police to seize *every* cell phone found inside a residence based on the conclusory assertion that the house was a "clubhouse." He also claims that once the officers ascertained that the phones were not Grundy's, they should have stopped searching them without obtaining another warrant specific to those phones. We conclude that even if we assume that the warrant was overbroad, however, the officers were entitled to rely on it in good faith because it was not facially defective.

The Fourth Amendment requires that warrants be supported by probable cause and that they describe with particularity the places and objects to be searched and seized. These requirements are related. The particularity requirement "ensures that the scope of a search will be confined to evidence relating to a specific crime that is supported by probable cause." *United States v. Vitek Supply Corp.*, 144 F.3d 476, 481 (7th Cir. 1998). Warrants that are overbroad, that is, that allow officers to search for items that are unlikely to yield evidence of the crime, violate the Fourth Amendment. Balancing these concerns is highly fact- and context-specific. A warrant that

may be overbroad in one context may be sufficiently specific where the officers have less reliable information about where, exactly, the evidence is likely to be found. *Id.*; see generally *United States v. Bishop*, 910 F.3d 335, 336 (7th Cir. 2018) ("Criminals don't advertise where they keep evidence.").

"The fruits of a search based on an invalid warrant may be admitted at trial if the executing officer relied on the invalid warrant in good faith." *United States v. Orozco*, 576 F.3d 745, 750 (7th Cir. 2009), citing *United States v. Leon*, 468 U.S. 897, 922 (1984). Where an officer goes through the effort to secure a warrant, we presume the officer acted in good faith. *Id.*, quoting *United States v. Mykytiuk*, 402 F.3d 773, 777 (7th Cir. 2005). The good-faith exception to the suppression rule does not apply, however, when, among other situations, "the affidavit is 'bare bones' or 'so lacking in indicia of probable cause' that reliance is unreasonable[] [or] when the warrant is facially deficient in that it fails to specify the place to search or the items to seize." *United States v. Glover*, 755 F.3d 811, 819 (7th Cir. 2014), quoting *Leon*, 468 U.S. at 923.

To succeed on his suppression motion, Moseby must show not only that the warrant that authorized the search of his phones was overbroad but that it was objectively unreasonable for an officer to think that the warrant was legitimate even though a judge had issued it. The search warrant in question authorized a search of one of Grundy's residences. The warrant allowed the executing officers to "search and seize" "Cellular telephones and all electronic data stored within the memory of the cellular telephones." Neither the warrant nor the warrant application discussed Mr. Moseby or his phones. When the officers executed the warrant on November 17, 2017, Grundy and Moseby were present, along with three

other co-conspirators. The officers found two cell phones in a bedroom, one on a bed, and the other on the floor next to it. They also found a bag containing a handgun and a receipt with Moseby's name for one of the cell phones. (The phones were registered to the same number and had identical content.) The phones both belonged to Moseby and contained incriminating data that was the basis of much of the government's case against him.

Moseby makes several arguments. He argues that a warrant allowing police officers to enter a suspect's home and seize every phone is necessarily overbroad. He says that the warrant was obviously overbroad here because it allowed officers to continue searching the phones even after they ascertained that they were not the wiretap's "target phones" and did not belong to Grundy. Moseby also asks us to apply a heightened standard of review because the warrant here concerned cell-phone searches, which he says are especially constitutionally sensitive.

The government counters that the warrant was not overbroad because the target location was Grundy's "clubhouse," so that any phones found there were reasonably likely to have a nexus to the gang's criminal activity. Also, the government points out, we must face the realities of drug-dealing and police searches. Criminals do not neatly label which cell phone belongs to whom, and officers would be foolish to trust self-serving denials. Even if the warrant was defective, the government says, officers relied on it in good faith.

This warrant application was full of references to cell phones. It opened with a list of the fourteen "target phones" for the wiretaps. It then summarized selected calls for over seventy pages, not to mention other references to cell phones

in other parts of the warrant. The application established that cell phones provided crucial infrastructure for Grundy's drug network and that they likely captured additional criminal activities beyond those recorded by the wiretaps.

The list of target phones also underscored that Grundy and his gang seemed to treat cell phones as fungible and tried to conceal the true owner of each phone. The list of target phones showed, for example, that at least some conspirators had multiple phones, each with a different number. None of the listed phones was used by the person who had registered it. For many phones, subscriber information was unavailable. At least two of those that did list subscriber information used obviously fake names or contact information, such as Tyler Jones of "1234 abcfe ave" (used by Nathaniel Dixson) and "Hector FFFFFFFFF" (used by David Carroll).

The warrant application was less specific about Grundy's residences, though. The affidavit explained that Grundy likely knew he was under surveillance and/or a target of rival gangs. Wary of surveillance, he covered his tracks and made it difficult to discern where he would be or stay at any given time. Nonetheless, the warrant application identified the residence to be searched as the "clubhouse" for Grundy's gang. The sub-bullet points under this assertion, however, had little to nothing to do with why the residence was a clubhouse. They mostly discussed Grundy's family.

Moseby's overbreadth argument is that the warrant here was not "as specific as circumstances allowed." *Bishop*, 910 F.3d at 338. He says that the warrant should have either limited the phones to be seized to those that were used in drug trafficking or required officers to obtain a second warrant to search any phone that had been seized. These options are

available and are often used by issuing judges. See, e.g., *United States v. Eggerson*, 999 F.3d 1121, 1127 (8th Cir. 2021) ("The second warrant, which police got after they seized Eggerson's phone and which was limited to its contents, is even less suspect."); *United States v. Wagner*, 951 F.3d 1232, 1247–48 (10th Cir. 2020) (search warrant implicitly required nexus between computers to be seized and child pornography, and failure to specify ownership was immaterial because it was unknown which computers were used for child pornography); cf. *United States v. Griffith*, 867 F.3d 1265, 1277 (D.C. Cir. 2017) (where police officers intend to rely on a second warrant to search phones, the initial warrant must expressly limit agents' authority to examine any electronic devices seized); *Vitek Supply*, 144 F.3d at 481 (distinguishing between legal and illegal items to be searched, but noting that in practice, such limits may have little practical effect if officers cannot distinguish between the two). Moseby is correct that the warrant's failure otherwise to limit the types of phones to be seized opens the door for further mischief based on the conclusory assertion that the place to be searched was Grundy's "clubhouse."

Moseby argues that these mutually reinforcing gaps are especially troubling because they allowed the officers to search the cell phone of every person who happened to be in the same house as Grundy. In *Riley v. California*, the Supreme Court held that police must obtain a warrant before searching a cell phone found on an arrestee during a search pursuant to arrest. 573 U.S. at 386. The Court noted people's heightened privacy interests in cell phones relative to other objects that may be searched pursuant to arrest: "Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." *Id.* at 393. As

compared to rummaging indiscriminately through a person's home, the archetype of a search that violates the Fourth Amendment, "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house." *Id*. at 396.

The *Riley* opinion included sweeping language about the privacy implications of warrantless searches of cell phones, but the Fourth Amendment holding was relatively limited: "a warrant is generally required before such a search, even when a cell phone is seized incident to arrest." *Id.* at 401. Or, more pithily, "get a warrant." *Id*. at 403. Here, of course, the officers did so, and it expressly authorized searches of any cell phones found at the location.

In support of his overbreadth argument, Moseby relies on *United States v. Griffith*, which held that the *Leon* good-faith exception did not apply when officers seized a cell phone pursuant to a warrant based on an obviously overbroad and under-specific affidavit. 867 F.3d 1278–79. In that case, the defendant was suspected of murder. Following the murder, he was incarcerated for another crime for a year. When he was released, the officers sought a warrant to search his house and seize, among other things, all electronics found there, including his cell phone. The affidavit did not contain any information establishing a nexus between the murder and any electronics, let alone that Griffith even had a cell phone. The connection between the hypothetical phone and the crime (the year-old murder) was merely that most people own cell phones, most cell phones capture what their users do, Griffith is a person, we think he's a criminal, so we think there exists a cell phone that captured evidence of a crime. The allegation that supposedly provided probable cause to search Griffith's

home for evidence in the first place was that he had a hypo-thetical cell phone that contained hypothetical evidence.

The appellate court reversed the district court's denial of Griffith's suppression motion: "officers seeking authority to search a person's home must do more than set out their basis for suspecting him of a crime." *Id.* at 1279. The overbreadth of the warrant was especially striking in that case because it allowed the seizure and search of *all* electronic devices, and it was unlikely that Griffith's current phone would have contained incriminating evidence for a crime that had occurred over a year earlier. *Id.* at 1278–79. In other words, a reasonable officer should have known that the cell phone request was fishy, that the authorization to seize and search *every* electronic device in Griffith's house (to which he had just returned after prison) was overbroad, and that the justification for the search was circular.

The warrant application here was substantially stronger. See *Eggerson*, 999 F.3d at 1126 & n.3 (distinguishing *Griffith*). The central role of cell phones to Grundy's gang is apparent throughout the 170-page search warrant application. As noted, the application showed that members of Grundy's crew used multiple phones that were unregistered or registered to others. Unlike *Griffith*, there was an obvious likely connection between the crime and the phones, and there was good reason to think that Grundy and his crew had multiple phones that would be difficult to identify as being used by particular individuals. As the Supreme Court instructed in *Riley*, law enforcement here obtained a warrant—and one that specifically authorized seizure and search of cell phones.

Based on these facts, a warrant authorizing the seizure and search of any phone found in what was thought to be

Grundy's clubhouse, regardless of its registration, was not so overbroad as to defeat the good-faith exception. It would have been possible to frame the warrant request more narrowly, but that is not the good-faith standard. Grundy and his crew's extensive use of cell phones, combined with their attempts to cover their tracks, established enough of a nexus that a warrant authorizing seizure and search of all phones in their clubhouse, regardless of ownership, was not so obviously invalid that an agent or officer should have refused to execute it.

This logic emphasizes the assertion that the property was the dealers' clubhouse as opposed to an ordinary residence. We agree that, as in *Griffith*, a search warrant may be overbroad by authorizing without probable cause the seizure of all electronic devices in a location. *Griffith*, 867 F.3d at 1271-76. Moseby argues that the "clubhouse" assertion was too conclusory to support such a sweeping search and that the police officers should have known that this was too "bare bones" to support a warrant. Moseby is correct that there are no other *specific* factual allegations (such as observations of other gang members entering or leaving) indicating that the residence was in fact a clubhouse.

In support he relies on *United States v. Koerth*, 312 F.3d 862, 867, 870 (7th Cir. 2002), which criticized a three-paragraph warrant application as conclusory, but we ultimately found that the evidence in *Koerth* was properly admitted under the good faith exception because the warrant's defects were not so obvious that a reasonable officer could not have relied on it in good faith. The line between a conclusory allegation and factual matter can be difficult to draw, even for experienced lawyers and judges. Under *Leon*, law enforcement officers do not need to patrol that line for magistrate judges. The warrant

application here could have been more specific, especially given the heightened constitutional stakes of searching multiple phones, but that lack of specificity does not require suppression of this evidence.

Finally, Moseby argues that the officers should have known that the warrant was overbroad because it allowed them to search his phone even after they ascertained that it did not belong to Grundy. This argument misunderstands the good-faith question. The warrant authorized the officers to search every phone found in Grundy's clubhouse regardless of who owned it or claimed to own it. A search of a phone they found there was not outside the scope of the warrant, even if it was apparent that the phone did not belong to Grundy. We affirm the denial of Moseby's motion to suppress and his conviction.

## IV. *Sufficiency of the Evidence*

Defendants Atwater, Neville, and Beasley all contend that no rational jury could have convicted them and that the district court should have granted their Rule 29 motions for judgment of acquittal. All three contest their convictions on Count 1 for conspiracy to distribute controlled substances, 21 U.S.C. §§ 846 & 841(a)(1). Neville also contests his conviction on Count 24, conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h), and Beasley contests his conviction on Count 17, constructive possession of methamphetamine at Koch's house in violation of 21 U.S.C. § 841(a)(1).

For challenges based on the sufficiency of the evidence, we review the evidence in the light most favorable to the government. *United States v. Bey*, 725 F.3d 643, 649 (7th Cir. 2013). Our review is deferential but not a rubber-stamp of affirmance. We

have sometimes said that a defendant seeking a judgment of acquittal for insufficient evidence faces a "nearly insurmountable hurdle," e.g., *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017) (collecting cases), but the height of the hurdle the defendant must overcome depends directly on the strength of the government's evidence. *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019), citing *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013).

A.  *Conspiracy or Buyer-Seller?*

We consider first Count 1, challenged by all three of these appellants. There is no doubt there was a large conspiracy, but we must address this charge one defendant at a time. Charges for conspiracy to distribute drugs hold "a unique position in our legal sufficiency jurisprudence." *United States v. Pulgar*, 789 F.3d 807, 812 (7th Cir. 2015). The government must prove beyond a reasonable doubt that the defendant knowingly agreed, perhaps implicitly, with someone else to distribute drugs. Conspiracies must be distinguished from buyer-seller relationships. An agreement to buy drugs (even a large quantity) is not necessarily an agreement to join a drug distribution conspiracy. *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). To be liable for conspiracy, a defendant must have "'a stake in the venture' and therefore exhibit[] 'informed and interested cooperation.'" *United States v. Brown*, 726 F.3d 993, 998 (7th Cir. 2013).

Distinguishing an agreement to distribute drugs from a buyer-seller relationship can be challenging for judges and juries. The issue is often whether circumstantial evidence allows a jury to infer beyond a reasonable doubt that the defendant *agreed* to enter the conspiracy. Generally speaking, circumstantial evidence of an agreement to distribute drugs

may fail to rule out the alternative plausible inference that there is just a slightly more formalized buyer-seller relationship. *Johnson*, 592 F.3d at 755. Where the jury is left with two equally plausible inferences from the circumstantial evidence, guilty or not guilty, it must necessarily entertain a reasonable doubt. *Id.* (collecting cases).

We use a "totality-of-the-circumstances approach in these cases." *Pulgar*, 789 F.3d at 813. Nonetheless, there are some rules of thumb that can help us distinguish a conspiracy from a normal buyer-seller relationship: "sales on credit or consignment, an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the other's business, or an agreement to warn of future threats to each other's business stemming from competitors or law-enforcement authorities." *Johnson*, 592 F.3d at 755–56. We have sometimes described these factors as supporting an inference of heightened trust, but evidence of mutual trust alone is insufficient. See *Pulgar*, 789 F.3d at 815–16.

Where a person repeatedly buys large quantities of drugs on credit, a jury can infer that the person entered into the conspiracy. *Brown*, 726 F.3d at 1002. Beyond that, charting the dividing line between a buyer-seller relationship and a conspiracy is as much an art as a science. See *Pulgar*, 789 F.3d at 813; see also *United States v. Colon*, 549 F.3d 565, 567–71 (7th Cir. 2008) (collecting cases in this and other circuits on distinguishing buyer-seller relationships and conspiracies). For example, the district court's jury instructions here tracked the Seventh Circuit Pattern Instructions:

> A conspiracy requires more than just a buyer-seller relationship between a defendant and

another person. In addition, a buyer and seller of controlled substances do not enter into a conspiracy to distribute controlled substances simply because the buyer resells the controlled substance to others, even if the seller knows that the buyer intends to resell the controlled substance. To prove a conspiracy, the government must prove that a buyer and seller had the joint criminal objective of further distributing controlled substances to others.

See *The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit*, § 5.10(A) (2020 Ed.). These can be fine hairs to split, but the government carries the burden of producing evidence that, if believed, would allow a factfinder to make this distinction. We now turn to each of these three appellants' sufficiency challenges.

B. *Atwater*

The evidence that Derek Atwater was part of the Grundy conspiracy was sufficient. The evidence at trial, taken in the light most favorable to the government, showed that he engaged in several large-quantity transactions on credit, which strongly suggests his agreement to distribute the drugs.

The primary testimony against Atwater at trial came from David Carroll, one of Grundy's distributors who sold drugs to Atwater. Carroll testified extensively as to Atwater's drug purchasing habits, telling the jury that Atwater bought one-ounce quantities of methamphetamine regularly over a sustained period, and walking the jury through several sales. Carroll estimated that Atwater bought methamphetamine a "couple times a week" over the course of four or five months.

He also testified that "a little under … half" the time, Atwater purchased drugs on credit. Other evidence indicated an agreement to distribute the drugs, such as Atwater's request that Carroll package the drugs separately, but the credit sales were the most relevant factor.

If the jurors believed Carroll's testimony—and we must presume they did—then they could infer beyond a reasonable doubt that Atwater agreed to distribute drugs on behalf of Carroll. Given their history of wholesale-quantity deals on credit, a reasonable jury could have rejected the alternative inference that Atwater and Carroll had only a buyer-seller relationship. *Brown*, 726 F.3d at 1002; see also *Colon*, 549 F.3d at 569–70 (purchases on credit can distinguish buyers from co-conspirators). We affirm Atwater's conviction.

C. *Neville*

Neville challenges two of his convictions, for the money-laundering conspiracy and the larger drug-trafficking conspiracy. We look first at the evidence of money laundering. The conviction relates to the $84,500 in cash that Grundy had sent to Vizcarra-Millan to purchase drugs and that was seized by law enforcement in August 2017. The factual question that Neville disputes is whether the evidence showed that he had contributed to that pool. He does not dispute that the other elements of conspiracy to launder monetary instruments were met.

The evidence at trial showed that Grundy pooled cash from various lieutenants to purchase larger quantities of drugs. The cash seized in the August 2017 bust came from "ten, twelve, twenty, [or] fifteen" of Grundy's associates. The government also offered evidence that Neville contributed to

a drug distribution ring that he called the "dub club." Reserving for a moment the question whether Neville was a co-conspirator or merely a buyer, the government offered evidence of a sustained drug-dealing relationship between Grundy and Neville. One witness, Carroll, testified that he thought Neville was present during a meeting among people who lost their money in the seizure. Finally, soon after Grundy's cash was seized, Neville complained to a confidential informant that he just "took a thirteen thousand dollar loss."

The jury could reasonably convict. The evidence of Neville's participation in Grundy's drug pool was, with the exception of Carroll's testimony, circumstantial, but the inferential links the jury had to make to convict were all reasonable. Most of Neville's arguments stray beyond our standard of review on appeal. He says that the jury should not have concluded that his statement that he "lost" money referred to the seizure of the $84,500. Perhaps he misplaced another $13,000? He also says that Carroll's testimony was vague and had little corroboration. But we review the evidence in the light most favorable to the government. The inference that Neville lost his $13,000 to government agents who had just seized his associate's cash was reasonable, and Carroll's testimony was not so fantastic that we could treat it as incredible as a matter of law. E.g., *United States v. Cherry*, 920 F.3d 1126, 1139 (7th Cir. 2019) ("To find a witness's testimony to be incredible as a matter of law, it must have been physically impossible for the witness to have observed that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.") (cleaned up).

We turn next to Neville's Count 1 conviction for conspiracy to distribute drugs. As with Atwater, considerable

evidence showed that Neville purchased large quantities of drugs from Grundy. The question is whether the government's evidence proved that he was a member of the conspiracy. The government did not argue that the evidence of money laundering is the "something more" that could sustain the conspiracy conviction, so we do not rest our holding on that basis. But see *United States v. Hopper*, 934 F.3d 740, 757 (7th Cir. 2019) ("The Government also presented considerable testimony establishing that Mr. Hopper pooled his resources with other members of the conspiracy to obtain methamphetamine at a reduced cost from out-of-state sources. This is circumstantial evidence of an agreement to distribute drugs….").

Ample evidence allowed the jury to find that Neville was a member of Grundy's conspiracy. Neville was a wholesale buyer. He bought large quantities of drugs directly from Grundy and Grundy's business partner, Emilio Mitchell II. Other evidence tied the two even more closely. Grundy and Neville once had an extended phone conversation about another Grundy subordinate and whether he was up to the challenges of dealing drugs. Neville also helped other lower-level members of Grundy's crew on several occasions. He cross-referred customers to others in Grundy's orbit a couple of times, and he stored drugs for another of Grundy's dealers. Viewing the evidence in the light most favorable to the government, this was sufficient evidence of intra-conspiracy cooperation. See *United States v. Maldonado*, 893 F.3d 480, 485 (7th Cir. 2018) (cooperation between defendant and conspirators supported his conspiracy conviction). Put differently, the jury was entitled to reject the possibility that Neville afforded these professional courtesies to competitors rather than to co-conspirators.

More evidence also tied Neville to the conspiracy. Early on in the conspiracy's timeline, Neville was caught in Albuquerque smuggling cocaine across the country. He concedes that taking the evidence in the light most favorable to the government, it showed that he was acting as a courier for Grundy. He also bought pound quantities of methamphetamine on credit several times. See *United States v. Moreno*, 922 F.3d 787, 795–96 (7th Cir. 2019) (multiple large purchases on credit supported guilty verdict on conspiracy charge, especially when paired with evidence of cooperation).

This mosaic of evidence was enough for a reasonable jury to reject the alternative hypothesis that Neville was a mere buyer without any additional stake in Grundy's enterprise. The courier work alone may be enough to rule out an alternative buyer-seller hypothesis. See *United States v. Salinas*, 763 F.3d 869, 877–78 (7th Cir. 2014) (affirming courier's conspiracy conviction). In addition, Neville time and again helped with the internal affairs of the conspiracy, providing a sounding board for Grundy, helping other dealers, and buying pound quantities of methamphetamine on credit. This all provided ample evidence that Neville was part of the conspiracy. See *Moreno*, 922 F.3d at 795–96 (circumstantial evidence supported conspiracy conviction); cf. *United States v. Johnson*, 592 F.3d 749, 755–56 (7th Cir. 2010) (circumstantial evidence was inadequate to support conspiracy conviction where it failed to distinguish buyer-seller relationship).

Neville attempts to poke holes in various pieces of evidence, but the standard of review is deferential to jury verdicts. For example, he points out that the government did not corroborate testimony with cell-site location data or wiretaps. That is an argument for a jury, not a court of appeals. The

government is not required to put on all conceivable or even all available corroborating evidence, lest jury trials become even longer and more complex. We affirm Neville's convictions.

### D. *Beasley*

Beasley was convicted of three offenses: Count 1, for conspiring with the Grundy gang to distribute drugs; Count 16, for possessing the methamphetamine found on his person after Susan Koch's car was pulled over and he was searched; and Count 17, for constructive possession of the methamphetamine recovered from Koch's home after she told the officers to search there.

Beasley does not challenge the sufficiency of the evidence on Count 16, the 120 grams of methamphetamine found on his person in the traffic stop. He challenges the other two convictions. First, he claims that his limited involvement with Carroll was perfectly consistent with a buyer-seller relationship, so that a reasonable jury would necessarily have entertained a reasonable doubt as to whether he joined the conspiracy. He is correct. The evidence was consistent with both a buyer-seller relationship and nascent involvement in the conspiracy. The jury had no basis to choose the conspiracy finding beyond a reasonable doubt. The jury should not have convicted him on that count. Second, he argues that the evidence at trial did not establish that he possessed the methamphetamine found at Koch's home. He is correct that the *admissible* evidence did not support a finding of that connection beyond a reasonable doubt.

The government's evidence supporting the conspiracy charge against Beasley was notably weaker than for Neville

or Atwater. Beasley bought drugs from Carroll several times over the course of a few weeks. The quantities rose from one ounce to two ounces to seven ounces. There was evidence suggesting that Carroll gave him a $100 discount or credit on one transaction. And during one of the intercepted calls played at trial, Carroll was heard praising Beasley for being a good drug salesman.

The evidence was consistent with an inference that Beasley joined the conspiracy at an inopportune moment, just as federal agents were closing in. But the evidence was at least equally consistent with an inference that Beasley and Carroll had only a buyer-seller relationship, with Carroll's one-time discount and encouragement showing only the work of a good wholesale salesman trying to develop a profitable relationship with a new retailer-customer.

Consider the $100 discount or credit. The evidence did not make clear whether this was a credit, a discount, or a negotiated lower price. The government's primary evidence that Carroll once floated Beasley $100 is a wiretap in which Carroll agreed to sell Beasley two ounces of methamphetamine for $700 when the going rate would have been $800. At trial, Carroll described this as a partial front of $100, but he later conceded that he did not extend credit to Beasley.

We do not need to determine whether the $100 is better described as a front or a discount. Either way it was extremely weak evidence of conspiracy. See *Johnson*, 592 F.3d at 756–57 (rejecting government's attempt to characterize a negotiation as a credit and dismissing idea that a $30 discount could support inference of conspiracy at all); *United States v. Pulgar*, 789 F.3d 807, 814 (7th Cir. 2015) (vague evidence of a couple of fronts insufficient to sustain conspiracy conviction). Even if

this was a one-time $100 credit, our case law is clear that "occasional sales on credit are consistent with an ordinary buyer-seller relationship," and we must view those credits in context. *United States v. Neal*, 907 F.3d 511, 516 (7th Cir. 2018) (quotation marks and citation omitted). In the context of this new wholesaler-retailer relationship, Carroll's small, one-time credit looks too much like a courtesy for a new customer to support an inference beyond a reasonable doubt of an agreement between the two to distribute drugs further. See *United States v. Brown*, 726 F.3d 993, 999–1000 (7th Cir. 2013) (distinguishing credit sales from consignment and explaining that small and infrequent credits are consistent with a buyer-seller relationship); see also *Moreno*, 922 F.3d at 794–96 (evidence of two very large credit sales supported conspiracy conviction within context of year-long wholesale drug-selling relationship and evidence of cooperation).

The other wisps of evidence are no stronger. Beasley increased his purchases from one ounce to two to seven during the weeks he bought from Carroll. That is not evidence of conspiracy. Context matters. In some cases, a buyer choosing to purchase greater quantities of drugs can signify that he has thrown his lot behind the conspiracy. Here the government has certainly shown that Beasley took to drug dealing, but Count 1 required more. The government needed to show beyond a reasonable doubt that Beasley agreed to distribute drugs *for Carroll* (which originated with Grundy). Buying multiple large quantities over a long period of time is not by itself sufficient to show such an agreement. *Moreno*, 922 F.3d at 794, citing *Maldonado*, 893 F.3d at 485. The same goes for buying an ounce or two a few times and larger amounts a few times. The evidence of growing trust between Carroll and Beasley was consistent with a buyer-seller relationship and

therefore could not carry the government's case over the finish line. E.g., *Brown*, 726 F.3d at 998–99 (discussing *Colon*'s rejection of "mutual trust" as a potentially dispositive factor).

The final piece of conspiracy evidence that the government cites is Carroll's encouragement. He congratulated Beasley on his entrepreneurial success and urged him to sell more drugs: "You're clowning. I ain't going to lie to you … I am proud of you … Just stay motivated. Just stay wanting more. Don't get comfortable. You got to want more." We have said that "'stimulation, instigation,' or 'encouragement'" can indicate an agreement to join the conspiracy where the defendant attempts to stimulate interest in the broader conspiracy. *United States v. Colon*, 549 F.3d 565, 568 (7th Cir. 2008), quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943). But here, there is no evidence that *Beasley* was encouraging Grundy or Carroll. Rather, on one occasion, Carroll encouraged Beasley. A seller's one-time, unspecific encouragement of a buyer is not enough to prove beyond a reasonable doubt that the *buyer agreed* to distribute drugs *for the seller*. See, e.g., *Colon*, 549 F.3d at 570 (mutual understanding of intent to resell is not "germane" to whether there was a conspiracy); see also Pattern Instruction § 5.10(A) ("a buyer and seller of [name of drug] do not enter into a conspiracy to []distribute [name of drug] … simply because the buyer resells the [name of drug] to others, even if the seller knows that the buyer intends to resell the [name of drug].").

Carroll encouraged a good customer to keep up his purchases and to keep doing a good job. In the non-criminal economy, such praise and encouragement are routine, without turning sellers and buyers into joint venturers. See *Pulgar*, 789 F.3d at 815–16 (evidence consistent with seller being a good

salesperson cannot rule out buyer-seller relationship), citing Ruth Klein, *The Everything Guide to Being a Sales Rep: Winning Secrets to a Successful—and Profitable—Career!* 176 (2006) ("Successful sales professionals often find that they and their customers become good friends."). In sum, the evidence against Beasley did not allow a finding beyond a reasonable doubt of more than a buyer-seller relationship, so we must reverse his conviction on Count 1.

Finally, we turn to Beasley's conviction on Count 17 for possession of the three ounces of methamphetamine found at Koch's house. For this count, the government relied on a theory of constructive possession in which an individual is deemed to possess contraband items without a showing of immediate, physical control of the objects. E.g., *United States v. Schmitt*, 770 F.3d 524, 534 (7th Cir. 2014). "Constructive possession may be established by demonstrating that the defendant knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). In more practical terms, the "owner of an automobile possesses it even when it is parked in a garage and he is miles away. A tenant possesses the apartment he has rented even when he is away on a trip." *United States v. Brown*, 724 F.3d 801, 805 (7th Cir. 2013).

The government's theory was that Beasley had recently bought two ounces of methamphetamine from Carroll in front of a clothing store called Hangtime. After Susan Koch was pulled over with Beasley as her passenger, she told the police that he had spent the night at her house. During a consensual search of her bedroom, she told the officers that Beasley had left something at her house, and she directed

them to a shoebox next to a bag from Hangtime. The shoebox contained three bags of methamphetamine, totaling three ounces. Soon after the arrest, Koch also told a member of the larger conspiracy, Robert Lisenby, that Beasley stored methamphetamine at her house and that the police had found it, and Lisenby relayed that conversation to co-conspirator Carroll. The government did not offer any evidence that Beasley had a possessory interest in Koch's home. The only evidence of any kind of relationship between Beasley and Koch was that they drove together, that Koch told the officer that Beasley had spent the night at her house, and that Lisenby suggested the two dated intermittently.

If Koch had testified at trial that the methamphetamine was Beasley's, the conviction would stand, of course. The problem is that Koch did not testify at trial. Others' reports of her statements blaming Beasley for the drugs found in her home were not admissible as evidence against him. When a police officer started to testify about Koch's statements, Beasley properly objected that they were hearsay, that is, out-of-court statements offered to prove the fact of the matter asserted. See Fed. R. Evid. 801(c); *Crawford v. Washington*, 541 U.S. 36 (2004) (admission of testimonial hearsay violates Confrontation Clause of the Sixth Amendment). Koch's out-of-court statements could not be used to prove that Beasley had spent the night or that he controlled the drugs found in her bedroom.

The district court allowed the introduction of Koch's statement to the officers as "course of investigation" evidence. See *United States v. Law*, 990 F.3d 1058, 1063 (7th Cir. 2021) (affirming admission of cumulative course-of-investigation testimony that explained how law enforcement zeroed in on a

sophisticated, intercontinental sex-trafficking ring). The court also properly issued a limiting instruction: the officer could relay Koch's statements about Beasley having left something at her house, but the jury could consider the statements only for their value in explaining why the officer interrupted a traffic stop to drive to Koch's house and search her bedroom. It could not consider it as direct evidence of Beasley's possessory interest.[7]

---

[7] It is not apparent to us why the government would need to explain that interruption, except as a means of introducing hearsay. Such risky uses of course-of-the-investigation testimony show why we "are reluctant to permit 'course of the investigation' rationale for fear of its abuse or misuse." *Law*, 990 F.3d at 1063, quoting *United States v. Marchan*, 935 F.3d 540, 546 (7th Cir. 2019); see also *Carter v. Douma*, 796 F.3d 726, 736 (7th Cir. 2015) (affirming denial of state prisoner's habeas petition because he could not show prejudice under *Strickland*: "The problem, as we have explained time and again, is that the 'course of investigation' gambit is so often abused and/or misunderstood that it is an evidentiary and constitutional minefield.") (citations omitted); *Jones v. Basinger*, 635 F.3d 1030, 1046 (7th Cir. 2011) (granting habeas corpus relief to state prisoner: "While such 'course of investigation' evidence usually has little or no probative value, the dangers of prejudice and abuse posed by the 'course of investigation' tactic are significant."). The course-of-investigation statements here were particularly dubious. The police had just noted that Koch's car smelled like marijuana and had drug-dealing paraphernalia strewn about it. We doubt that a jury would have wondered why they then searched Koch's house. There was no suggestion that "the officers were officious intermeddlers staking out [Koch] for nefarious purposes." *United States v. Silva*, 380 F.3d 1018, 1020 (7th Cir. 2004) (reversing conviction and remanding for new trial). In addition, Koch had obvious incentives to shift responsibility for the drugs in her bedroom, offering substantial grounds for cross-examination if she had testified. The "course-of-investigation" gambit appears to have been used to admit her statement, albeit with a limiting instruction, without requiring her testimony in court.

Likewise, Koch's statements to Lisenby were also hearsay, but Beasley did not object and therefore forfeited the argument that Koch's hearsay should not have come in. But Lisenby's statements were admitted pursuant to the conspiracy exception to the hearsay rule: at a co-conspirator's trial, another co-conspirator's out-of-court statements made in the course of and pursuant to the conspiracy may be admitted for the truth of the matter asserted. See Fed. R. Evid. 801(d)(2)(E). But for reasons explained above, Beasley was not shown to have been a member of a conspiracy with Lisenby, Carroll, or others. Accordingly, Lisenby's gossip about what Koch had told him was not admissible as direct evidence against Beasley. Lisenby's recorded statements are especially suspect given that they seem to have been used to launder the out-of-court statements by Koch, who as noted did not testify at trial.

Without the two direct connections between Beasley and the methamphetamine, the evidence that Beasley constructively possessed the drugs found in Koch's home was too sparse. The government showed only that Beasley bought drugs in front of a clothing store and that a different quantity of drugs was later found in the house of someone he knew next to a bag from that clothing store. An inference that those were the drugs that Beasley purchased in front of Hangtime would have justified further investigation, but it was not enough to support guilt beyond a reasonable doubt.

The convictions of Richard Grundy III, Derek Atwater, Undrae Moseby, Gilberto Vizcarra-Millan, and Ezell Neville are AFFIRMED. James Beasley's conviction on Count 16 is AFFIRMED, but his convictions for Counts 1 and 17 are REVERSED. Beasley's case is REMANDED for resentencing on Count 16.